United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 4, 1998 Decided November 6, 1998 

 No. 97-1524

 Time Warner Cable, 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 On Petition for Review and Cross-Application 

 for Enforcement of an Order of the 

 National Labor Relations Board

 Jon W. Tryon argued the cause for the petitioner.

 Leslie Randolph, Attorney, National Labor Relations 
Board, argued the cause for the respondent. Linda Sher, 
Associate General Counsel, Aileen A. Armstrong, Deputy 
Associate General Counsel at the time the brief was filed, and 
Peter Winkler, Attorney, were on brief. John D. Burgoyne, 


Acting Deputy Associate General Counsel, entered an appear-
ance.

 Before: Williams, Henderson and Garland, Circuit 
Judges.

 Opinion for the court filed by Circuit Judge Henderson.

 Karen LeCraft Henderson, Circuit Judge: Time Warner 
Cable, Inc. (Time Warner) petitions for review of an order of 
the National Labor Relations Board (NLRB or Board) con-
cluding that it engaged in an unfair labor practice by refusing 
to bargain with the Communication Workers of America, 
Local 1120 (Union). Time Warner Cable, 324 N.L.R.B. No. 
25 (Aug. 5, 1997). The NLRB cross-applies for enforcement 
of its order. Time Warner admitted that it refused to 
bargain but challenged the validity of the Union's certification 
based on the NLRB's disqualification of a challenged, and 
potentially determinative, ballot. As explained below, we 
conclude that the NLRB's decision was not based on substan-
tial evidence and therefore, grant Time Warner's petition and 
deny the Board's cross-application for enforcement.

 I.

 On March 5, 1995, the Union petitioned the NLRB seeking 
certification as the exclusive collective bargaining representa-
tive at Time Warner, formerly Paragon Communications d/b/a 
Paragon Cable of Newburgh, New York (Cable),1 for "all full-
time and regular part-time service technicians ... employed 
by the employer at or out of its 400 Auto Park Place, 
Newburgh, New York facility." Paragon Communications 
d/b/a Paragon Cable, Hearing Officer's Report (Sept. 18, 
1996) (hereinafter Hearing Officer's Report), Joint Appendix 
(JA) 7A. The original election ended in a tie and the Union 
filed an objection alleging management misconduct. The 
NLRB agreed with the Union and on September 25, 1995, it 
ordered a second election. The Notice of Second Election 
also specified the eligible voters:

__________
 1 Time Warner's predecessor and Primestar operated as divi-
sions of Paragon Communications Northeast Division (Paragon 

 Included: All full-time and regular part-time service 
 technicians, installer technicians, warehouse coordinators, 
 customer service representatives, production staff, and 
 dispatchers employed by the employer at or out of its 400 
 Auto Park Place, Newburgh, New York Facility;
 ...
 Eligible voters are those in the unit who were em-
 ployed during the payroll period ... [ending September 
 15].
Paragon Communications d/b/a Paragon Cable, Notice of 
Second Election (Sept. 18, 1996), JA 1A-2A. The rerun 
election was conducted on October 6, 1995. Of the twenty-
eight ballots cast, fourteen were for unionization, thirteen 
were against and the Union challenged one ballot, cast by 
Willie Jackson. JA 8A.

 Cable had hired Jackson in February 1994 as an installer 
and promoted him to the position of installer technician in 
August 1994, at which time he received a raise. JA 12A. 
After an initial orientation period, Jackson was assigned a 
vehicle and generally worked alone, performing installation 
and some repair work. Id. In March 1995 Jackson applied 
for and received a higher paid position performing similar 
work for Primestar. At Primestar Jackson oversaw "quality 
control of the work performed by contractors retained to 
install satellite dishes." Id.

 While the Union initially challenged Jackson's ballot on the 
ground that he was a member of management, id. at 10A, it 
changed its position during the hearing to challenge whether 
Cable had employed Jackson in the unit as of the eligibility 
date. Id. The hearing officer then issued a subpoena for 
relevant documents2 and allowed testimony on the Union's 
__________
Northeast), which operated cable and satellite systems for Time 
Warner in New York, New Hampshire and Maine. Cable was one 
of nine cable television operations Paragon Northeast operated and 
Primestar was one of its two satellite service divisions. Paragon 
Communications d/b/a Paragon Cable, Hearing Officer's Report 
(Sept. 18, 1996), Joint Appendix (JA) 11A. Paragon Northeast has 
since been disbanded. Id.

 2 The subpoena directed Paragon to produce Jackson's payroll 
records and timesheets for June 1, 1995 to September 30, 1995. JA 
151.

new issue. Id. at 8A-9A n. 2. The Union, however, called no 
additional witnesses on the issue. It had already called 
Jackson to testify on the management member issue and 
Cable then called Gemma Slacik, Paragon Northeast's area 
manager. Based on perceived inconsistencies between their 
testimony and the documentary evidence, the hearing officer 
decided that Jackson was not a regular part-time employee as 
of the eligibility date. Id. at 17A-19A. She concluded that 
"as of September 15, the payroll eligibility date herein, Jack-
son had a conditional promise of employment, but had not yet 
returned to work as a regular, part-time employee" of Cable. 
Id. at 20A. Noting an earlier Board decision that had 
declared ineligible an employee who was in the bargaining 
unit before the eligibility date but had not performed unit 
work for a " 'sufficiently substantial amount of time,' " the 
hearing officer implied a similar fate for Jackson. Id. at 20 
n.11 (quoting Meadow Valley Contractors, 314 N.L.R.B. 217, 
217 (1994)).

 Cable filed exceptions to the hearing officer's report and on 
January 15, 1997 the Board issued an order denying oral 
argument and affirming the hearing officer. In re Paragon 
Communications d/b/a Paragon Cable, 2-RC-21521 (Jan. 15, 
1997), JA 24A. On March 28, 1997, the Union filed an unfair 
labor practice charge alleging that Cable violated sections 
8(a)(1) and 8(a)(5) of the National Labor Relations Act (Act), 
29 U.S.C. ss 151 et seq. by refusing to bargain. Cable 
admitted its failure to negotiate but challenged the Union's 
status as the exclusive bargaining representative. On August 
5, 1997 the Board concluded that "[a]ll representation issues 
raised by [Cable] were or could have been litigated in the 
prior representation proceeding," Time Warner Cable, 324 
N.L.R.B. No. 25, at 1 (Aug. 5, 1997), granted the General 
Counsel's summary judgment motion and ordered Cable to 
cease and desist from violating sections 8(a)(1) and 8(a)(5) of 
the Act. Id. at 2. Cable petitioned for review, invoking this 
Court's jurisdiction pursuant to section 10(f) of the Act.


 II.

 Our role in reviewing the NLRB's findings of fact is 
limited. We will reverse the NLRB only if its findings are 
not "supported by substantial evidence on the record consid-
ered as a whole." 29 U.S.C. s 160(e); see also Universal 
Camera Corp. v. NLRB, 340 U.S. 474, 493 (1951). We also 
give substantial deference to the inferences drawn by the 
NLRB from the facts. Peoples Gas Sys., Inc. v. NLRB, 629 
F.2d 35, 42 (D.C. Cir. 1980). We do not, however," 'merely 
rubber stamp NLRB decisions,' " Davis Mem'l Goodwill In-
dus. v. NLRB, 108 F.3d 406, 410 (D.C. Cir. 1997) (quoting 
Avecor, Inc. v. NLRB, 931 F.2d 924, 928 (D.C. Cir. 1991)) 
and, in reviewing the findings, we must "take into account 
whatever in the record fairly detracts from [their] weight." 
Universal Camera, 340 U.S. at 488.

 In order to vote in a representation election, an employee 
must be "employed and working on the eligibility date." 
NLRB v. Dalton Sheet Metal Co., 472 F.2d 257, 258 (5th Cir. 
1973). At the hearing both Jackson and Slacik testified 
without contradiction that Jackson was employed by and 
working for Cable as of the eligibility date. JA 42-43 (Jack-
son's testimony); id. at 127, 130-31 (Slacik's testimony). 
Jackson testified that in August 19953 Slacik approached him 
about returning to work for Cable because Cable was under-
staffed. Jackson testified that he accepted the position part-
time, effective immediately, planning to work for Primestar 
on Monday and Friday and for Cable on Tuesday, Wednesday 
and Thursday. Because of the short notice, however, he and 
Slacik agreed that if Jackson needed additional time for 
Primestar work, Slacik would allow it. JA 61. Slacik like-
wise testified that Jackson was working at Cable before the 
eligibility date. She testified that when she learned that 
Primestar was relocating its Newburgh operations to Bing-
hamton, New York, she met with Jackson about his returning 
to Cable. JA 127. She made a record of the meeting in a 
September 8 memorandum, noting that on September 6 she 
met with Primestar's general manager (Eric Behre) and 

__________
 3 All dates referred to occurred in 1995 unless otherwise noted.

Jackson and informed Jackson in confidence that Primestar 
was relocating. The memorandum also noted that "[i]t was 
determined as a result of this meeting that Willie [Jackson] 
fit the Installer/Tech 2 job description and salary range and 
he was rehired on a part-time basis until the Primestar office 
officially closed at which time he would become a full-time 
employee." JA 221. Finally, the memorandum noted that on 
September 7 Jackson accepted the offer.

 Rejecting this evidence, the hearing officer first focused on 
the Employee Change Request Turnaround Document (turn-
around form) that Cable prepared in connection with Jack-
son's return. JA 18A. She noted that the turnaround form 
indicated an "Effective Date" of September 22 and that 
Slacik had testified that personnel actions were only propos-
als until approved by either Joan Judge, Paragon Northeast's 
Human Resources Director, or Paragon Northeast's Presi-
dent, Robert Merlese.4 Id. at 18A. But the hearing officer's 
reliance on the turnaround form ignored the relationship that 
existed between Primestar and Cable. First, both were part 
of the Paragon Northeast and, until its relocation, Primestar 
shared office and warehouse facilities with Cable. Id. at 13A. 
Second, Paragon Northeast paid the employees, including 
Jackson, of both Cable and Primestar. JA 133A. Third, 
Jackson's 1995 transfers between Primestar and Cable were 
effectuated by internal transfer procedures, he reported to 
the same facility throughout his employment, id. at 13A, and 
he retained the same benefits package. JA 133A-37A. In 
addition, nothing in Slacik's testimony suggested that a per-
sonnel change that eventually failed to receive Judge's or 
Merlese's approval was void ab initio rather than simply 
reversed. For example, nothing indicated that a transferred 
employee would not be paid because he had worked in his 
"new" (but ultimately disapproved) position. JA 120A. 
Thus, the testimony that a transfer was not "final" until 
approved by Judge or Merlese does not determine whether, 
and when, Jackson worked in the new position. Given these 
factors, we do not believe that the September 22 "[e]ffective" 

__________
 4 Neither Judge nor Merlese testified.


date overrides the uncontested testimony that Jackson was in 
fact employed by and working for Cable as of September 15.5 
JA 41-43, 59, 130-31.

 The hearing officer also disregarded Slacik's September 8 
memorandum as evidence that Jackson had returned to work 
for Cable before the September 15 eligibility date based on 
inconsistencies she perceived in evidence regarding Jackson's 
and Slacik's August and early September meetings. The 
testimony on the issue was limited,6 however, and the incon-
sistencies were not necessarily inconsistencies or, if they 
were, they were, at most, trivial. First, the hearing officer 
noted that Slacik testified that she approached Jackson be-
cause Primestar was relocating, JA 18A, while Jackson testi-
fied that Slacik approached him because of a personnel 
shortage at Cable, JA 19A. The hearing officer also noted 
Jackson's testimony that management told him about 
Primestar's relocating during an October 13 employee meet-
ing7 as well as Jackson's failure to testify, when he was asked: 
"[D]id Ms. Slacik tell you why she was asking you to come 
back to [Cable]?" JA 43, that he intended to become a full-

__________
 5 We do not, however, agree with Time Warner that the Sep-
tember 22 date was an "apparent clerical error." Pet'r Br. at 18. 
The document manifests that the date was changed from (perhaps) 
a single-digit date in September to September 22 by the hand 
notation of "JJ," presumably Joan Judge. JA 244.

 6 As noted earlier, the Union originally challenged Jackson's 
ballot on the ground that he was a member of management. The 
theory that Jackson was not working in the bargaining unit as of 
the eligibility date did not arise until the middle of Slacik's testimo-
ny, after Jackson had testified. JA 110.

 7 Jackson testified:

 Q [Cable]: "Mr. Jackson, has anyone told you what's going to 
 happen to Primestar?"
 A [Jackson]: "Yes. We had a--on October 13th, the new 
 General Manager came down. We had a meeting. And what 
 we learned is that, it will no longer list--remain Primestar."

JA 72A.

time Cable employee once Primestar relocated. But the 
Union never asked Slacik why she met with Jackson. In-
stead the hearing officer concluded that Primestar's reloca-
tion was Slacik's only reason for meeting with Jackson based 
merely on Cable's question to Slacik on direct examination 
that she explain her September 8 memorandum.8 And Jack-
son's testimony regarding Primestar's relocation also arose 
from the single question, "Mr. Jackson, has anyone told you 
what's going to happen to Primestar?" JA 72A. Jackson 
was never asked when he first, and confidentially, heard 
about the relocation.9

 Finally, the hearing officer discredited Jackson's time-
sheets. She noted that for the weeks ending September 8 
and 15 the timesheet showed that Jackson received eight 
hours of "holiday pay," seventy-two hours of "regular pay" 
and three hours of "overtime"; the timesheet, however, failed 
to attribute the overtime or holiday pay to either Primestar 
or Cable. JA 16A. The hearing officer emphasized the 
hand-printed notation:

 Cable 16 HRS 
 Primestar 64 HRS.

__________
 8 Slacik testified:

 Q [Cable]: Would you please explain that document?

 A [Slacik]: [The September 8, 1995 memo is a memo] to Willie 
 Jackson's file from me ... which details the discussion that we 
 had with Willie Jackson when we found out that Primestar 
 Satellite Services was going to be moving ...

 And it just pretty much details discussions that we had in [sic] 
 the offer we put on the table.... 

JA 127.

 9 In rejecting Slacik's September 8 memorandum, the hearing 
officer also noted that it listed September 7 as the date of reemploy-
ment while Slacik dated her signature on the turnaround form on 
September 6. JA 19A. We fail to see any significance in the 
different dates.

Id. She noted that Slacik initialed the notation and that in 
her opinion Jackson did not print the notation. Id. Jackson's 
timesheet for the weeks ending September 22 and 29 con-
tained similar hand-printed notations. Based on "the dispari-
ty between the time recorded as compared to that which was 
allocated [the three-day, two-day allocation], the ambiguity as 
to who noted the breakdown of Jackson's time,10 and the 
discrepancy between the hours allocated to Cable during this 
two-week period and Jackson's clear testimony" (emphasis 
added), the hearing officer concluded that she could not "rely 
upon these documents to establish when Jackson commenced 
working at Cable." Id. at 20A.

 At least two of the hearing officer's three reasons for 
rejecting the timesheets' credibility, however, are not sup-
ported by the record. The "disparity" between the recorded 
and the allocated times, that is, the difference between the 
Primestar (Monday and Friday) and Cable (Tuesday, Wed-
nesday, Thursday) allocations, on the one hand, and the 
recorded 16 hours for Cable and 64 hours for Primestar, on 
the other, was expressly anticipated as Jackson's testimony 
and Slacik's September 8 memorandum make clear.11 And 
the "discrepancy" between the 16 hours allocated to Cable 
and Jackson's "clear" testimony also disappears when Jack-
son's actual testimony is reviewed. He testified that "Slacik 

__________
 10 Neither Jackson nor Slacik was asked whose handwriting was 
on the timesheets.

 11 Jackson testified:

 Q [Union]: Now, you testified that Ms. Slacik--if you have 
 work that you need to do for Primestar on Tuesday, Wednes-
 day or on Thursday, Ms. Slacik allows you to do that?

 A [Jackson]: We made an agreement that if we had a problem 
 that, if we had a problem that came--arose, as far as a delivery 
 of some equipment, that I could let her know and she would 
 allow me the time to go back and take care of that.

JA 71. Slacik's September 8 memo noted: "As issues of Primestar 
closure came up, [Primestar management and I] would work togeth-
er to resolve them, even if that meant changing the agreed upon 
schedule." JA 221A.

has been relaxed in that manner. If I have deliveries or 
something comes up, that I can get--let them know what 
problems might arise at Primestar, that I may go back and 
take care of that." JA 61.

 Finally, the hearing officer's footnote inference that Jack-
son, even if he was doing unit work as of September 15, had 
not worked for a " 'sufficiently substantial amount of time,' " 
JA 20 n.11 (quoting Meadow Valley Contractors, 314 
N.L.R.B. at 217), is unsupported by the record. The NLRB 
determines the right of a dual-function12 employee to vote in a 
bargaining unit representation election by weighing whether 
the employee "regularly performs duties similar to those 
performed by unit employees for sufficient periods of time to 
demonstrate that [he has] a substantial interest in the unit's 
working conditions." Martin Enters., Inc., 325 N.L.R.B. No. 
133, at 2 (April 30, 1998). The NLRB "has no bright line rule 
as to the amount of time required to be spent in performing 
unit work. Rather, the [NLRB] examines the facts in each 
particular case." Id.

 After his meeting with Slacik, which, it bears noting, oc-
curred before the eligibility date had been set, Jackson re-
turned to unit employment. See JA 1A-2A. In the two 
weeks immediately preceding the eligibility cut-off date, Au-
gust 30 to September 15, Jackson worked sixteen hours for 
Cable according to his timesheet. JA 238. In the two weeks 
after the eligibility cut-off date, September 16 to September 
29, Jackson worked twenty-four hours for Cable according to 
his timesheet.13 JA 239. Cf. Stockholm Valve & Fittings, 

__________
 12 The dual-function analysis is used for employees "who per-
form more than one function for the same employer." Martin 
Enters., Inc., 325 NLRB No. 133, at 2 (April 30, 1998). To 
determine the eligibility of a dual-function employee the Board uses 
the part-time employee test. Textron Lycoming Div., Avco Corp., 
308 N.L.R.B. 1045, 1045 (1992).

 13 The NLRB has considered post-eligibility date work in deter-
mining the eligibility of both dual-function and part-time employees. 
See, e.g., Meadow Valley, 314 N.L.R.B. at 217; Stockholm Valve & 
Fittings, Inc., 222 N.L.R.B. 217 (1976).

Inc., 222 N.L.R.B. 217 (1976) (finding eligible part-time em-
ployees who were hired month before election and who 
worked five days by election day). At a minimum, then, 
Jackson worked forty hours in the unit before the election 
and unit work accounted for at least thirty per cent of his 
time in two of the three weeks between the eligibility date 
and the election. The Board has identified no case in which 
an employee worked as high a percentage of hours in the 
bargaining unit in the weeks before the election date and yet 
was denied voting rights. In the absence of such precedent, 
we believe this work level demonstrates a sufficient interest 
in the bargaining unit's conditions of employment to warrant 
his inclusion in the unit, especially in light of the surrounding 
circumstances. First, Jackson began unit work before the 
eligibility date was set. Second, Jackson's hours increased 
during the relevant time period as Jackson transferred part-
time into the unit. Third, Jackson worked the hours as part 
of a permanent return to the unit. JA 221. These circum-
stances make clear that Jackson worked in the unit for a 
sufficient time to demonstrate Jackson's substantial interest 
in the unit's working conditions and, thus, his eligibility to 
vote.

 III. Conclusion

 Notwithstanding the substantial deference we give to 
NLRB orders, we do not find substantial evidence in this 
record to support its conclusion that Jackson was not em-
ployed and working in the bargaining unit as of the eligibility 
date. We further find the hearing officer's alternative, and 
inferential, conclusion that Jackson worked insufficient hours 
to demonstrate a "substantial interest in the terms and 
conditions of employment" unsupported. Accordingly, we 
grant Time Warner's petition, deny the Board's cross-
application for enforcement and order that the ballot of Willie 
Jackson be opened and counted.

 So ordered.