**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-2362**

GESTAMP SOUTH CAROLINA, L.L.C.,

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent.

**No. 12-1041**

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

GESTAMP SOUTH CAROLINA, L.L.C.,

Respondent.

On Remand from the Supreme Court of the United States.
(S. Ct. No. 13-1103)

Decided on Remand:  October 8, 2014

Before TRAXLER, Chief Judge, KEENAN, Circuit Judge, and R. Bryan HARWELL, United States District Judge for the District of South Carolina, sitting by designation.

Petition for review granted in part and denied in part; cross-application for enforcement granted in part and denied in part by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Keenan and Judge Harwell joined.

---

John J. Coleman, III, Marcel L. Debruge, BURR & FORMAN LLP, Birmingham, Alabama, for Gestamp South Carolina, L.L.C. Stuart F. Delery, Assistant Attorney General, Beth S. Brinkmann, Deputy Assistant Attorney General, Douglas N. Letter, Scott R. McIntosh, Melissa N. Patterson, Benjamin M. Shultz, Dara S. Smith, Attorneys, Appellate Staff, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Richard F. Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Usha Dheenan, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board.

---

TRAXLER, Chief Judge:

Gestamp South Carolina, LLC, petitioned for review of an order of the National Labor Relations Board ("the NLRB" or "the Board") affirming the decision of an administrative law judge ("ALJ") finding that Gestamp discharged employees David Anthony Kingsmore and Reggie Alexander in violation of the National Labor Relations Act ("the NLRA") and that Gestamp was liable for another violation of the NLRA as well. The Board cross-applied for enforcement of the order.

In an earlier decision, we granted Gestamp's petition for review, denied the Board's cross-application for enforcement, vacated the Board's decision, and remanded the case for further proceedings, based upon our determination that the recess appointment of Board Member Craig Becker deprived the Board of a valid quorum to act when it issued its order. The Supreme Court subsequently granted the Board's petition for certiorari, vacated our opinion, and remanded for further consideration in light of its decision in NLRB v. Noel Canning, 134 S. Ct. 2550 (2014).

For the reasons set forth below, we now conclude that Board Member Becker's recess appointment was valid. We grant Gestamp's petition for review in part and deny it in part, and we grant the Board's cross-application for enforcement in part and deny it in part.

3

I.

In January 2013, after oral argument had been held in this case, Gestamp raised as an additional issue the question of whether the Board had a quorum of validly appointed Board Members when it issued its order. Specifically, Gestamp argued that Board Member Craig Becker had been unconstitutionally appointed to the Board during an intra-session recess of the Senate in March 2010, in violation of the Recess Appointments Clause. See U.S. Const. art. II, § 2, cl. 3.

Shortly thereafter, this court issued an opinion in a separate case finding invalid three different recess appointments that had been made to the Board during a three-day intra-session recess in January 2012. See NLRB v. Enterprise Leasing Co. Southeast, 722 F.3d 609, 652 (4th Cir. 2013). Among other things, the Enterprise Leasing panel held that the Recess Appointments Clause permits the President to make such appointments only during inter-session Senate recesses, not during intra-session recesses. See id.; see also NLRB v. New Vista Nursing & Rehab., LLC., 719 F.3d 203, 208, 221 (3d Cir. 2013) (reh'g granted, Aug. 11, 2014); Noel Canning v. NLRB, 705 F.3d 490, 506 (D.C. Cir. 2013), aff'd on other grounds, NLRB v. Noel Canning, 134 S. Ct. 2550 (2014).

In October 2013, we applied Enterprise Leasing to this case and held that Board Member Becker's appointment was likewise

4

invalid.  See Gestamp v. NLRB, 547 F. App'x 164, 165 (4th Cir. 2013) (per curiam); see also New Vista, 719 F.3d at 221 (holding that "'the Recess of the Senate' means only intersession breaks," and, therefore, "that [Board] Member Becker's appointment was invalid").  Accordingly, we vacated the Board's decision, and remanded the case to the NLRB for further proceedings.  The Board then petitioned the United States Supreme Court for a writ of certiorari.

In NLRB v. Noel Canning, 134 S. Ct. 2550 (2014), the Supreme Court affirmed the D.C. Circuit's determination that the recess appointments of the three Board Members at issue in that case were invalid.  In doing so, however, the Supreme Court disagreed with the lower court's reasoning, making it clear that the Recess Appointments Clause applies to both inter-session recesses and "intra-session recess[es] of substantial length," id. at 2561, as well as to Board vacancies that occur prior to or during the recess, id. at 2567.  The Court additionally held, however, that Senate "pro forma sessions" must be considered, id. at 2574, and affirmed the judgment because the resulting three-day recess at issue there was "too short a time to bring [the] recess within the scope of the Clause."  Id. at 2557; see id. at 2578.

Relying heavily on historical practice, the Court confronted the "interpretive problem [in] determining how long a

5

recess must be in order to fall within the Clause," id. at 2565-66, and concluded "that a recess of more than 3 days but less than 10 days [would be] presumptively too short to fall within the Clause," id. at 2567. The addition of "the word 'presumptively,'" the Court explained, was "to leave open the possibility that some very unusual circumstance – a national catastrophe, for instance, that renders the Senate unavailable but calls for an urgent response – could demand the exercise of the recess-appointment power during a shorter break." Id.[1]

Shortly thereafter, the Supreme Court granted the Board's petition for a writ of certiorari in this case, vacated our judgment, and remanded for further consideration in light of its decision in Noel Canning. See NLRB v. Gestamp, 134 S. Ct. 2901 (2014). In contrast to the recess appointments of the Board members at issue in Noel Canning and Enterprise Leasing, which took place over a three-day recess in January 2012, the recess appointment of Board Member Becker took place over a two-week recess in March 2010. Accordingly, we now hold that Board Member Becker was validly appointed to the Board when it issued

_____

[1] Recognizing that there were "petitions [pending] from decisions in other cases involving challenges to the appointment of Board Member Craig Becker," as well as "similar challenges . . . pending in the Courts of Appeals," the Court believed it was important to answer all three questions presented in the case before it, Noel Canning, 134 S. Ct. at 2558, including the proper "calculation of the length of a 'recess,'" id. at 2556.

the order in this case. See Teamsters Local Union No. 455 v. NLRB, No. 12-9519, 2014 WL 4214920, at *2 (10th Cir. Aug. 27, 2014) (noting that because Board Member Becker "was appointed during an intra-session recess exceeding two weeks . . ., there seems little reason to [now] doubt the validity of [his] appointment."). Having already had the benefit of full briefing and oral argument on the remaining questions presented in this case, we now proceed to decide Gestamp's original challenges to the Board's order.

II.

A.

LSP Automotive ("LSP") owned and operated a plant in Union, South Carolina that manufactures metal body parts for BMW vehicles that BMW assembles at a nearby facility. In May 2007, LSP hired Kingsmore, a former BMW employee, as a quality inspector. LSP hired Alexander in June 2007 as a supply coordinator.

On October 1, 2009, Gestamp purchased the facility from LSP and retained LSP's employees and personnel policies, including those provided in LSP's employee handbook. The handbook provided, as is relevant here, that "[m]isleading or false statements . . . made during an interview" or "[f]alse . . . entries . . . in any books or records of the Company" could

7

result in LSP withdrawing any employment offer or in termination. J.A. 371, 377. The handbook provided for multiple levels of discipline depending upon the severity of the misconduct but reserved for the company the right, in its sole discretion, to impose the level of punishment it deemed appropriate.

### Union Activity

Kingsmore contacted the United Steelworkers ("the Union") in late December 2009 regarding the possible organization of the facility's hourly employees. Alexander and Kingsmore were both among the seven or eight employees on an organizing committee that the Union helped form and which met approximately four times in January and early February 2010. Alexander and Kingsmore also both spoke to other employees about supporting the Union.[2] The Union's strategy, which was conveyed to Alexander, Kingsmore, and others, was to keep organizing efforts secret from the management. Nevertheless, management became aware of the efforts as a result of many questions it was receiving from employees.

Kingsmore's and Alexander's roles in the unionization effort also became known by some plant supervisors. In early February, Kingsmore told Supervisor and Quality Engineer Michael

---

[2] The Union decided in mid-February to discontinue its efforts to organize.

8

Fink that he intended to unionize the plant. Fink warned Kingsmore to be careful because if Gestamp General Manager Carmen Evola found out, Kingsmore would be "gone." J.A. 433 (internal quotation marks omitted). Kingsmore also told Supervisor Michael Sullivan that he was going to try to unionize Gestamp's employees. On another occasion, however, Kingsmore called General Manager Evola to deny possible rumors that he was part of the unionization effort.

In early to mid-February 2010, management conducted group meetings explaining its position concerning the Union. Several statements at the meetings showed that the union issue was evoking very strong feelings, including one threat by an employee that when he found out who called the Union, the employee and others would "whip his ass." J.A. 101. After the meeting, two employees together and another individually approached Alexander and accused him of being one of those attempting to organize the facility.

Alexander related these accusations to Maintenance Supervisor Daniel Morris. Following that conversation, Fink told Alexander, with another employee in the vicinity, "I didn't know you were one of the ones that were trying to bring the Union in." J.A. 46 (internal quotation marks omitted). Alexander offered no response.

9

<u>Kingsmore's Suspension and Discharge</u>

On August 13, 2009, Kingsmore and Morris were instructed as part of their jobs to go on a tour of the BMW facility. When they arrived at the facility, Morris was allowed in, but a BMW guard refused to allow Kingsmore to enter. BMW representatives did not give him or Morris any explanation for denying Kingsmore entry. Kingsmore immediately called his supervisor, Alex Keller, to report the incident. According to Kingsmore, he also told Evola about the incident that day when he returned to LSP.

In September 2009, Kingsmore applied for an internal promotion to a quality supervision position and interviewed with Human Resources Director Susan Becksted for the position later that month. During the interview, Kingsmore told Becksted that he had left his previous job with BMW because of the length of the drive to BMW's plant, the long hours, and his desire to spend more time with his young family. Despite the fact that the job for which he was interviewing required him to have access to BMW's premises, Kingsmore did not mention that he had been barred from the facility. Kingsmore did not receive the promotion.

In early February 2010, Evola told Becksted that he had just learned that Kingsmore had been banned from BMW's premises. Becksted told Evola that the ban caused her concern for two reasons. First, since she knew other Gestamp employees who had

10

worked at BMW previously but were not banned from the facility, she questioned whether Kingsmore had lied when he told her he had left BMW voluntarily. Second, Gestamp needed its employees to have access to BMW's premises at certain times. Evola asked Becksted to investigate both why Kingsmore left BMW and why he was banned from the premises.

Becksted began by contacting Keller, who confirmed that Kingsmore had been denied access to BMW's facility. After consulting again with Evola, Becksted then met with Kingsmore and his manager Juergen Weckermen on February 17. Kingsmore continued to maintain that the reasons he had given in his interview for leaving BMW were correct. Becksted explained that she needed to know the reason for the ban and, in that regard, asked him to sign a release that she could provide to BMW. When Kingsmore hesitated, Becksted told him that he could be terminated if he refused to sign, and Kingsmore relented and signed the document. After consulting with Evola regarding whether to give Kingsmore a copy of the release, Becksted suspended Kingsmore with pay, effective immediately, and told him that during the suspension he was not to enter Gestamp's premises or contact Gestamp employees since doing so would interfere with her investigation.

Becksted sent the release to BMW on February 17 but received no response. She testified that she contacted BMW

11

within two business days of Kingsmore's suspension and briefly spoke to someone in human resources who refused to give her any information. She also testified that she did not remember whether she documented the conversation and she does not recall any details about the human resources employee to whom she spoke. On February 22, she told Kingsmore that she did not want her investigation to drag on and that he had until 5:00 p.m. on February 24 to obtain documentation from BMW explaining the reason he left BMW. BMW, however, would only provide Kingsmore with written documentation of the dates of his employment. Kingsmore faxed that documentation to Becksted on the afternoon of February 24. Upon receiving the information, Becksted informed Kingsmore that it was not what she had requested and that he was terminated. Kingsmore's employee separation checklist listed the reasons for his discharge as "[f]alsification of prior work history, not supplying proper documentation from prior employer as requested and not supplying information for reason of BMW's refusal to allow employee on property." J.A. 348.

### Alexander's Discharge

It was normal procedure for Gestamp employees to create weekly self-prepared timesheets that listed their start times, ending times, and total hours and to submit those to their supervisors. The company also maintained a system whereby

12

employees checked in and out of work electronically, and the resulting records were compared by supervisors to the employee-submitted time sheets.

Alexander had a pre-prepared timesheet template on his computer that included 7:00 a.m. start times. Alexander arrived late to work on both February 9 and 10. In preparing his time sheet – probably on Friday, February 12 – Alexander struck through the 7:00 a.m. start time for February 10 and wrote in the time he had actually arrived, which was 7:15 a.m.; however, he neglected to make any change noting that on February 9 he had arrived at 7:38 a.m. With Alexander having failed to make that change, the timesheet he submitted indicated that he arrived on time on February 9. Alexander's supervisor, Sullivan, noted the discrepancy in comparing the employee-submitted timesheets to the electronic records, advised Alexander of the problem, and changed Alexander's time sheet to reflect that Alexander had arrived at 7:38 a.m., and Alexander was not paid for the extra 38 minutes. When Becksted learned of the discrepancy, she met with Alexander on February 19, informed him that he had violated company policy, and terminated him for falsifying his timesheet.

### Complaint

Based on these facts, the Board's Acting General Counsel issued a complaint alleging unfair labor practice charges against Gestamp. As is relevant to this appeal, the complaint

13

alleges that Gestamp violated 29 U.S.C. § 158(a)(3) and (1) by suspending and discharging Kingsmore and by discharging Alexander because of their union organization efforts ("the discharge claims") and that Fink violated 29 U.S.C. § 158(a)(1) by warning Kingsmore that he would be fired if Evola found out he was trying to unionize the facility ("the threat claim").

Following a hearing, the ALJ found that Gestamp and Fink had committed the alleged violations. Regarding the discharge claims, the ALJ concluded that the General Counsel proved protected activity on the part of Alexander and Kingsmore since both participated actively in the union campaign. He concluded that knowledge of Alexander's and Kingsmore's union activity could be imputed to Gestamp by virtue of its supervisors' awareness of their participation. In response to an argument by Gestamp that the supervisors with knowledge were not involved in the employment decisions at issue, the ALJ acknowledged that the record was unclear whether Becksted made the adverse employment decisions herself or whether she consulted with others in making them. Nevertheless, the ALJ determined that knowledge of the union activity by Gestamp's "management" was established by circumstantial evidence, namely the evidence that the union campaign was highly charged, as exemplified by the threat of physical violence made by an employee against union supporters and by the accusations of union involvement made against

14

Alexander. J.A. 442. The ALJ also found that Kingsmore was suspended, and Alexander and Kingsmore were fired, because of anti-union animus and that Gestamp failed to show that it would have taken the same actions even in the absence of the protected activity.

The ALJ further found that Fink's warning to Kingsmore that Kingsmore would be fired if Evola learned of Kingsmore's attempt to unionize the plant constituted an unlawful threat under § 8(a)(1). The ALJ concluded that Fink's statement "reasonably conveyed the message that Kingsmore's protected activities might harm his employment and thus reasonably could have caused Kingsmore to fear reprisals for engaging in protected activities." J.A. 498.

The ALJ determined that Gestamp was liable for the statement, rejecting the company's argument that Fink's authority over two Gestamp employees that worked at the BMW plant was not sufficient to make him a supervisor. Having found the aforementioned violations, the ALJ recommended an order requiring Gestamp to cease and desist from its unfair labor practices, to reinstate Kingsmore and Alexander and make them whole, to remove any mention of the terminations from its files, and to post the required notice.

On appeal, a three-member panel of the NLRB affirmed the ALJ's decision and adopted the ALJ's recommended order with

15

minor modifications not relevant here.  Gestamp now petitions for review of the Board order and the Board cross-petitions for enforcement of the order.

B.

Gestamp first argues that because the ALJ did not find that the official who made the challenged employment decisions knew of the employees' union activity, the ALJ erred in concluding that the General Counsel established a prima facie case as to the discharge claims.  We agree.

"Although we ordinarily review questions of law de novo, the NLRB's interpretation of the Act is entitled to deference if it is reasonably defensible."  Industrial TurnAround Corp. v. NLRB, 115 F.3d 248, 251 (4th Cir. 1997).  However, the Board is required "to follow the law as set forth by the relevant court of appeals."  NLRB v. Flambeau Airmold Corp., 178 F.3d 705, 712 (4th Cir. 1999).

It is a violation of 29 U.S.C. § 158(a)(3) and (a)(1) to discharge an employee for engaging in protected union activity. See NLRB v. Transp. Mgmt. Corp., 462 U.S. 393, 397-98 (1983), overruled on other grounds by Director, OWCP v. Greenwich Collieries, 512 U.S. 267 (1994); Valmont Indus. v. NLRB, 244 F.3d 454, 463 (5th Cir. 2001).  In Transportation Management Corp., the Supreme Court approved the test set forth by the Board in Wright Line, 251 N.L.R.B. 1083 (1980), for mixed-motive

16

cases.  See 462 U.S. at 401-04.  Under that test, the General Counsel bears the burden of making a prima facie case that the challenged employment decision was at least partly motivated by discriminatory intent.  See Medeco Sec. Locks, Inc. v. NLRB, 142 F.3d 733, 741-42 (4th Cir. 1998).  Meeting this burden requires the General Counsel to prove "(1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the activity was a substantial or motivating reason for the employer's decision."  FPC Holdings, Inc. v. NLRB, 64 F.3d 935, 942 (4th Cir. 1995).  The employer-knowledge requirement entails proving knowledge "on the part of the company official who actually made the discharge decision." Firestone Tire & Rubber Co. v. NLRB, 539 F.2d 1335, 1338 (4th Cir. 1976); see Vulcan Basement Waterproofing of Illinois, Inc. v. NLRB, 219 F.3d 677, 685 (7th Cir. 2000); Pioneer Natural Gas v. NLRB, 662 F.2d 408, 412 (5th Cir. 1981).  Even if the General Counsel meets this burden, the employer can avoid liability if it can prove that the employee would have been discharged for legitimate reasons even absent the protected activity.  See Medeco Sec. Locks, Inc., 142 F.3d at 742.

As Gestamp asserts, the ALJ never found that the official making the discharge decisions was aware of Kingsmore's and Alexander's union activity, but rather only imputed Gestamp's supervisors' knowledge to Gestamp and alternatively found that

17

Gestamp's <u>management</u> knew of the activity.[3]  In fact, the ALJ acknowledged that the record was unclear whether Becksted made the adverse employment decisions herself or whether she consulted with others in making them.

The General Counsel defends the ALJ's decision on two bases.  He first suggests that Gestamp bore the burden of proving who made the discharge decisions.  He also argues that supervisors' knowledge of union activity can be imputed to the employer.

The General Counsel's first argument is easily handled, because it is the General Counsel and not Gestamp that bears the burden of proving the General Counsel's prima facie case, including the knowledge requirement.  See Firestone, 539 F.2d at 1338-39 ("[T]he burden of establishing . . . knowledge rest[s] on the Board.").[4]  As for the second argument, the General

---

[3] Gestamp also argues that the ALJ, instead of requiring that the General Counsel prove anti-union animus by a preponderance of the evidence, required only that the General Counsel produce evidence that could support an inference of anti-union animus. We disagree.  The ALJ explained that "[t]he General Counsel must show, either by direct or circumstantial evidence, that the employee engaged in protected conduct, the employer knew or suspected the employee engaged in such conduct, the employer harbored animus, and the employer took action because of this animus."  J.A. 440 (emphasis added).  Indeed, the ALJ's order makes clear that he found each of these elements was proven by a preponderance of the evidence.

[4] The General Counsel claims that our analysis in Firestone concerning the knowledge requirement was mere nonbinding dicta, (Continued)

18

Counsel is incorrect to the extent he suggests that supervisors' knowledge of an employees' union activity is <u>automatically</u> imputed to the employer. See <u>id.</u> at 1339 (refusing to impute supervisors' knowledge of employees' union activity to decision-maker). On the other hand, to the extent that the General Counsel argues only that a finding of decision-maker knowledge can be based on wholly circumstantial evidence, he is certainly correct. See <u>NLRB v. Grand Canyon Mining Co.</u>, 116 F.3d 1039, 1048 (4th Cir. 1997). However, as we have explained, the ALJ never found, based on circumstantial evidence or otherwise, that any Gestamp official involved in the decisions to suspend or fire Alexander or Kingsmore was aware of their union activity. Nor could the ALJ have made such a finding based on the record before him.

## C.

Gestamp also challenges the ALJ's finding that Fink's warning to Kingsmore about Evola constituted a § 8(a)(1) violation. On this violation, we disagree with Gestamp.

We are bound by the Board's factual findings and application of law to the facts "if they are supported by

---

apparently because it was only one of two different bases supporting the grant of the petition for review in that case. However, alternative holdings are not dicta. See <u>MacDonald, Sommer & Frates v. Cnty. of Yolo</u>, 477 U.S. 340, 346 n.4 (1986); <u>United States v. Fulks</u>, 454 F.3d 410, 434–35 (4th Cir. 2006).

19

substantial evidence on the record as a whole." WXGI, Inc. v. NLRB, 243 F.3d 833, 840 (4th Cir. 2001); see 29 U.S.C. § 160(e), (f). "Substantial evidence" is

> such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It is more than a scintilla but less than a preponderance. Although a reviewing court accords due deference to the Board's factual findings under the substantial evidence standard of review, the court does not mechanically accept those findings.

Vance v. NLRB, 71 F.3d 486, 489-90 (4th Cir. 1995) (per curiam) (alterations, citations, and internal quotation marks omitted). We may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

Section 7 of the NLRA guarantees employees the "right to self-organization, to form, join, or assist labor organizations," and the right "to engage in other concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) of the Act in turn protects those rights by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." 29 U.S.C. § 158(a)(1). The NLRA provides that "[t]he term 'employer' includes any person acting as an agent of an employer." 29 U.S.C. § 152(2). We have held that it is proper to attribute

20

liability to an employer for statements of a supervisor. See Benson Veneer Co. v. NLRB, 398 F.2d 998, 1000 (4th Cir. 1968). The NLRA defines "supervisor" to

> mean[] any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, <u>or effectively to recommend such action</u>, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11) (emphasis added).

Gestamp raises two challenges to the ALJ's finding that it violated § 8(a)(1), and we will address them seriatim.

Gestamp first argues that substantial evidence did not support the ALJ's finding that Fink was a supervisor for purposes of the alleged § 8(a)(1) violation. We disagree. The ALJ found that Fink was a supervisor by virtue of his authority over two Gestamp employees that worked at the BMW plant. The ALJ found that Fink gave them instructions; that they report to him or another employee, Beasley, if they have problems; and that the employees inform Fink or Beasley if they need to take time off for an emergency and that Fink then makes the initial decision whether to approve the leave. Fink and Beasley also prepare the two employees' biannual evaluations and review their training reports. The ALJ noted that while a third employee retained final authority regarding the emergency leave and

21

evaluation questions, he had never disagreed with Fink's recommendations. We conclude that these factual findings were supported by substantial evidence and warranted the ALJ's conclusion that Fink was a supervisor. See NLRB v. Yeshiva Univ., 444 U.S. 672, 683 n.17 (1980).

Gestamp next challenges the ALJ's finding that the conversation at issue took place as Kingsmore said it did. Gestamp argues that Fink's testimony regarding the conversation contradicted Kingsmore's account of it. Gestamp further contends that the ALJ found Fink to be "truthful and reliable" based in part on his "candid[]" testimony concerning the conversation at issue, but the ALJ found Kingsmore "not fully reliable." J.A. 426, 429. In light of the ALJ's credibility findings, Gestamp contends that no substantial evidence supports the finding that Fink told Kingsmore that if Evola discovered his pro-union activity, Kingsmore would be "gone." See Weather Shield Mfg., Inc. v. NLRB, 890 F.2d 52, 59 (7th Cir. 1989) (reversing NLRB finding based on witnesses ALJ discredited). We disagree with Gestamp's argument. Nothing prevented the ALJ from crediting portions of each witness's testimony and discrediting others. And while the ALJ found that Fink was a reliable witness and that he testified candidly concerning the conversation at issue, part of his candor was admitting that he did not recall all the details of the conversation. In light of

22

that fact, there was nothing contradictory about the ALJ's decision to accept Kingsmore's account.

## III.

For the foregoing reasons, we grant the petition for review and deny the cross-application for enforcement with respect to the discharge claims. We deny the petition for review with respect to the threat claim and grant the cross-application for enforcement with respect to that claim.

<u>PETITION FOR REVIEW GRANTED IN PART AND DENIED IN PART; CROSS-APPLICATION FOR ENFORCEMENT GRANTED IN PART AND DENIED IN PART</u>