**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-2066**

S. FREEDMAN & SONS, INC.

        Petitioner

v.

NATIONAL LABOR RELATIONS BOARD

        Respondent

and

DRIVERS, CHAUFFEURS AND HELPERS LOCAL UNION NO. 639

        Intervenor

**No. 16-2270**

NATIONAL LABOR RELATIONS BOARD

        Petitioner

v.

S. FREEDMAN & SONS, INC.

        Respondent

and

DRIVERS, CHAUFFEURS AND HELPERS LOCAL UNION NO. 639

        Intervenor.

---

On Petition for Review of an Order of the National Labor Relations Board. (05−CA−121221; 05−CA−132227; 05−CA−138025)

---

Argued: September 12, 2017                Decided: November 7, 2017

---

Before KEENAN, Circuit Judge, WYNN, Circuit Judge, and John A. GIBNEY Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

---

No. 16-2066 petition for review denied and No. 16-2270 cross-application for enforcement granted by unpublished per curiam opinion.

---

**ARGUED**: Scott V. Kamins, OFFIT KURMAN, P.A., Maple Lawn, Maryland, for Petitioner/Cross-Respondent. David A. Seid, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. John R. Mooney, MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C., Washington, D.C., for Intervenor. ON BRIEF: Richard F. Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Jill A. Griffin, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. Lauren P. McDermott, MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C., Washington, D.C., for Intervenor.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this labor dispute challenging the suspension and termination of an employee, we review claims involving S. Freedman & Sons, Inc. (the employer) and its employee, Richard Saxton, a senior delivery driver and union steward for Drivers, Chauffeurs and Helpers Local Union No. 639 (the union). The record before us shows that Saxton had a lengthy history of engaging in protected union activity under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (the Act). At issue here, on two occasions during 2014, the employer terminated Saxton's employment just days before scheduled administrative hearings regarding grievances he had filed against the employer. The employer ultimately changed one of these termination actions to a suspension after the union filed another grievance.

The National Labor Relations Board (the Board) affirmed an Administrative Law Judge's conclusion that the employer's disciplinary actions against Saxton violated the Act's prohibition (1) of discrimination against an employee for engaging in protected activity, and (2) of interfering with an employee's exercise of his rights under the Act. *See* 29 U.S.C. § 158(a)(1), (4). The employer petitions for review of the Board's order, and the Board has filed a cross-application for enforcement of its order.

Based on our review, we conclude that the Board's decision is supported by substantial evidence. We therefore deny the employer's petition for review and grant the Board's cross-application for enforcement.

3

## I.

The employer is a Maryland corporation that distributes paper supplies in the Mid-Atlantic region, and employs about 135 employees, including 28 delivery drivers. For the past 50 years, the employer's drivers and warehouse workers have been represented by the union. In 2013, the employer and the union entered into a collective bargaining agreement (the CBA), which was effective throughout the time period at issue in this case.

At the time of the 2014 events referenced above, Saxton, the employer's most senior delivery driver, had worked for the employer for 26 years and had served as the chief union steward for 17 of those years. In his capacity as union steward, Saxton participated in collective bargaining negotiations and often represented other employees regarding their grievances with the employer. Also, in 2013 and 2014, Saxton was involved in multiple disciplinary matters concerning his own conduct, including a termination from employment in 2013 after the employer determined that Saxton had caused a significant traffic accident in a company vehicle (the November 2013 traffic accident). Saxton later was reinstated to his driving position by the employer.

On July 1, 2014, about one week before a grievance hearing scheduled to address issues regarding Saxton's job performance, Saxton advised a supervisor that he could not report to work that day, because Saxton needed "to get a [driver's] license." Because the employer thought that Saxton's license had an expiration date of June 27, 2014, Vice President Jeff Thompson initiated an investigation to determine whether Saxton had driven a company vehicle while his license was expired.

4

On July 2, 2014, Saxton and his union representative, Antwoine Drayton, met with Thompson and Human Resources Director Meg Phillips. The parties dispute what statements were made during this meeting. According to the employer, Saxton admitted that his license had expired, and that he had needed to obtain a new license on July 1, 2014. Saxton, however, denies that he made such an admission at the meeting. He asserts that he informed Thompson and Phillips that he realized on June 30, 2014 that he had lost his license and needed to obtain a duplicate license on July 1, 2014. According to Saxton, Thompson repeatedly insisted that Saxton was lying and had driven while his license was expired, which statements caused Saxton to make a "frustrated remark" that the employer's accusations must be true.

During the meeting, union representative Drayton attempted to show Thompson and Phillips that Saxton's current license bore a "D" designation, indicating that the license was a duplicate issued after Saxton lost the original. According to Saxton, Thompson and Phillips refused to look at the current license or to concede that it was valid. Later that day, the employer obtained Saxton's records from the state motor vehicle administration, which showed the "D" designation and other information corroborating Saxton's explanation that he had renewed his license earlier in June 2014, and had obtained a duplicate license on July 1, 2014.

On the day after the parties' meeting, July 3, 2014, Thompson nevertheless terminated Saxton's employment for driving without a valid driver's license (the July 3, 2014 termination), just five days before a scheduled hearing on Saxton's prior grievance. On July 8, 2014, Saxton and union business agent Wayne Settles participated in a

grievance meeting with the employer, during which Saxton provided his records from the motor vehicle administration, and Settles explained the various dates and designations on those records to the employer. The employer confirmed Settles' explanation of the records with the employer's own external investigator shortly after the meeting.

Despite this documentary evidence and Saxton's repeated insistence that he had lost his license, the employer persisted in its contention that Saxton had driven while his license was expired. The employer stated in a July 17, 2014 submission to the Maryland Department of Labor that "an investigation confirmed that [Saxton] knowingly drove his Company truck without a valid driver's license."

The employer eventually decided to reinstate Saxton to his previous position, but declined to compensate him for the time he had been out of work. The employer informed the union on July 23, 2014 that Saxton's termination had been converted retroactively to an unpaid suspension (the July 23, 2014 suspension). In the employer's letter detailing this decision, Thompson explained that it was "now unclear to [the employer] whether [Saxton] drove without a license on June 30, [2014,]" and that Saxton was not entitled to retroactive compensation because he had been dishonest during the employer's investigation. The union filed grievances on Saxton's behalf challenging both the July 3, 2014 termination and the July 23, 2014 suspension.

Seven days before his scheduled hearing on these and prior grievances, Saxton was involved in another incident with the employer. On September 29, 2014, Saxton had returned to the employer's warehouse after completing his delivery route. As Saxton was "clocking out," his supervisor, Ellis Brown, asked Saxton to drive another employee's

6

truck to a repair facility, which was located nearby. According to Brown, he asked Saxton to complete the task because Saxton was the only driver available at the time. Saxton refused to drive the truck to the repair facility, because he had completed his contractually required eight hours of work. Saxton produced a copy of the CBA and explained that the agreement did not require Saxton, the driver with the most seniority, to accept overtime work when more junior drivers were available.

At this point, Thompson joined the discussion. He asked Saxton to accept the additional driving assignment, but Saxton again declined. According to Brown, Saxton then began to "yell and scream," used profanity, and continued to refuse the assignment. Thompson responded by telling Saxton to "punch out and don't come back tomorrow" (the September 29, 2014 termination). As Saxton left the premises through the parking lot, Saxton observed a more junior driver named Dennis Wade. Saxton shouted back into the warehouse that "Wade was available to take the f---ing truck" to the repair shop. When Drayton asked Saxton what happened, Saxton responded that "this motherf---er [Thompson] fired me again."

Shortly after leaving the warehouse, Saxton placed a telephone call to Settles, the union's business agent, to inform him that Thompson had fired Saxton for refusing to work overtime hours. After union president Tommy Ratliff discussed the incident with Thompson, union personnel informed Saxton that he should return to work the next day, September 30, 2014.

In accordance with this instruction, Saxton completed his assigned route on September 30, 2014, which included working some overtime hours. After Saxton

7

returned to the warehouse at the end of the day, Brown directed Saxton to speak with Thompson. Saxton refused on the ground that he had been informed he should not talk to Thompson without union representation. Instead, Saxton "clocked out" and left the premises. During this exchange with Brown, Saxton referred to Brown using a racially derogatory term.

Saxton also completed his work day on October 1, 2014. However, when he returned to work on October 2, 2014, Thompson gave Saxton a letter terminating Saxton's employment. The letter stated that Saxton was terminated "[e]ffective today, October 2, 2014," because on September 29 and 30, 2014 Saxton had "repeatedly refused to follow a supervisor's order, and also engaged in insubordination to management." The letter additionally cited two other "major offenses" involving Saxton that had occurred within the past year, including the November 2013 traffic accident. The union later filed an additional grievance challenging the September 29, 2014 termination.

After the Board filed a complaint on Saxton's behalf, the matter was submitted to an Administrative Law Judge (ALJ) for decision. The ALJ found that the employer had violated the Act when it disciplined Saxton for engaging in protected activities and participating in Board proceedings. The ALJ made these findings with respect to the July 3, 2014 termination, the July 23, 2014 suspension, and the September 29, 2014 termination. The Board affirmed the ALJ's decision.[1] The employer filed this petition

---

[1] The Board reversed the ALJ's determination that the employer had committed an additional violation of the Act, based on the contents of a settlement agreement between (Continued)

for review of the Board's order, and the Board filed a cross-application for enforcement of its order.

## II.

We will uphold the Board's factual findings, and the Board's application of the law to the facts, if those determinations are supported by substantial evidence when viewed in the context of the entire record. *Gestamp S.C., LLC v. NLRB*, 769 F.3d 254, 263 (4th Cir. 2014); 29 U.S.C. § 160(e), (f). Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence, and must be sufficient to permit a reasonable person to find that the evidence supports the conclusion reached. *Pac Tell Grp., Inc. v. NLRB*, 817 F.3d 85, 90 (4th Cir. 2015). We will not "displace the Board's choice between two fairly conflicting views," even if we would have made a different choice in the first instance. *Gestamp*, 769 F.3d at 263 (citation omitted). Because the task of evaluating the relative credibility of witnesses "is at the heart of the fact-finding process," we will not disturb the ALJ's credibility findings absent extraordinary circumstances. *NLRB v. Transpersonnel, Inc.*, 349 F.3d 175, 184 (4th Cir. 2003). We review the Board's legal conclusions de novo, but will defer to the Board's interpretation of the Act if that interpretation "is reasonably defensible." *WXGI, Inc. v. NLRB*, 243 F.3d 833, 840 (4th Cir. 2001) (citation omitted).

---

Saxton and the employer related to the November 2013 traffic accident. That decision is not at issue in this appeal.

9

A.

The employer first argues that the record lacks substantial evidence to support the Board's conclusion that the July 3, 2014 termination and the July 23, 2014 suspension violated the Act. According to the employer, the Board erroneously found that the employer's proffered reason for the July 3, 2014 termination was false. The employer asserts that, instead, the record showed that Saxton lied when he told Thompson and Phillips that his license had expired. Thus, the employer maintains that it was justified in taking disciplinary action against Saxton. We disagree with the employer's arguments.

Under Section 8(a)(4) of the Act, an employer engages in an unfair labor practice if the employer "discharge[s] or otherwise discriminate[s] against an employee because he has filed charges or given testimony" under the Act. 29 U.S.C. § 158(a)(4). To present a prima facie case of retaliation, the Board, on behalf of the employee, must show "(1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the protected activity was a substantial or motivating factor for the employer's action." *RGC (USA) Mineral Sands, Inc. v. NLRB*, 281 F.3d 442, 448 (4th Cir. 2002) (citing *Wright Line*, 251 NLRB 1083 (N.L.R.B. 1980)). If the Board establishes a prima facie case, the burden shifts to the employer to show that the employer would have taken the same action in the absence of the employee's union activity.[2] *Id.* (citing *FPC Holdings, Inc. v. NLRB*, 64 F.3d 935, 942 (4th Cir. 1995)).

---

[2] In addition to Section 8(a)(4), the Board also concluded that the employer violated the more general prohibition in Section 8(a)(1) against employer interference with an employee's exercise of his rights under the Act. *See* 29 U.S.C. § 158(a)(1). We (Continued)

An employer's motive is a question of fact that may be established by direct or circumstantial evidence. *FPC Holdings, Inc.*, 64 F.3d at 942. If an employer's proffered reason for an action is false, the Board may infer that the employer would not have taken the same action in the absence of the employee's protected activity. *Pro-Spec Painting*, 339 NLRB 946, 949 (N.L.R.B. 2003).

In the present case, the employer does not dispute that the first two prongs of the Board's prima facie burden are satisfied, namely, that Saxton was involved in protected activity in filing grievances against the employer, and that the employer was aware of this activity. Instead, the employer relies exclusively on its contention that Saxton's protected activity was not a substantial or motivating factor for the employer's actions.

At the hearing before the ALJ, the parties offered conflicting accounts of the events leading to the July 3, 2014 termination, including whether Saxton had made inconsistent or unclear statements regarding the status of his driver's license. In weighing this evidence, the ALJ found that the testimony of Thompson and Phillips regarding those events lacked credibility, and the Board affirmed those credibility findings. Moreover, as noted above, the record also included evidence that although the employer received notice before the July 3, 2014 termination that Saxton timely had renewed his license, the employer nonetheless persisted in contending that Saxton had

apply the same analysis originally set forth in *Wright Line* to these related challenges. *See generally NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983), *abrogated in part on other grounds by Dir., Office of Workers' Comp. Programs v. Greenwich Collieries*, 462 U.S. 393 (1994).

not done so long after that claim had been discredited. For these and other reasons, the Board concluded that the employer's proffered reason for firing Saxton was false.

We do not perceive any extraordinary circumstances in this case that would justify "second-guess[ing] [the] fact-finder's determinations about who was the more truthful witness." *See Transpersonnel, Inc.*, 349 F.3d at 184. We therefore decline the employer's invitation to revisit the ALJ's underlying credibility determinations, and we defer to the Board's resolution of the conflicts in the evidence. *See id.*; *Anheuser-Busch, Inc. v. NLRB*, 338 F.3d 267, 280 (4th Cir. 2003) ("When an administrative record is fraught with conflicting testimony, we are obliged to defer to the Board's resolution of such conflicts."). Accordingly, we conclude that the Board's determination that the July 3, 2014 termination violated the Act is supported by substantial evidence.

For the same reasons, we conclude that substantial evidence supports the Board's determination that the July 23, 2014 suspension violated the Act. The employer now concedes that Saxton did not drive a truck for the employer while his license was expired. However, in the July 23, 2014 suspension letter drafted after the employer's investigation was completed, Thompson stated that it still was "unclear" whether Saxton had driven while his license was expired, and that Saxton had been dishonest during the investigation. Given the Board's adverse credibility findings against the employer, and the Board's conclusion that the employer falsely relied on the status of Saxton's license in terminating his employment in July 2014, the Board reasonably concluded that the July 23, 2014 suspension violated the Act.

B.

The employer also challenges the Board's conclusion that the employer violated Section 8(a)(1) of the Act by terminating Saxton for his conduct on September 29, 2014. The employer contends that: (1) the Board erred in its fact-finding with respect to the date of Saxton's termination; (2) Saxton's conduct was not protected by the Act; and (3) Saxton's insubordination and refusal to comply with a supervisor's directive justified the employer's decision to terminate him. Again, we disagree with the employer's arguments.

Under Section 8(a)(1) of the Act, an employer engages in an unfair labor practice if the employer "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of the rights guaranteed in" Section 7 of the Act relating to employees' rights to organize and bargain collectively. 29 U.S.C. §§ 157, 158(a)(1). Section 7 also protects employees' rights "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Id.* § 157. An employee's conduct is considered "concerted activity" protected under the Act if that conduct "is based on a reasonable and honest belief that [the employee] is being, or has been, asked to perform a task that he is not required to perform under his collective-bargaining agreement, and the statement or action is reasonably directed toward the enforcement of a collectively bargained right." *NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 837 (1984). However, an employee may not engage in a concerted activity "with impunity" and, thus, an employee may forfeit the protection of the Act by engaging in concerted activity in an "abusive manner." *Id.*

13

Article 3, Section D of the CBA provides, in relevant part:

The Employer shall offer overtime to the most senior employee available at work, in accordance with classification seniority. The most senior employee available at work will be given the right to refuse to cover an assignment with the understanding that if the employer exhausts its seniority list and there still remains jobs to be covered, junior employees will be required to cover these assignments in order of reverse shift and classification seniority.

As an initial matter, we hold that substantial evidence supports the Board's determination that Saxton was terminated on September 29, 2014, the date of the incident in the warehouse, rather than on October 2, 2014, when Saxton received the official termination letter. Immediately after Saxton declined the overtime assignment on September 29, 2014, Thompson told Saxton to "punch out and not return the next day," which statement Saxton reasonably construed as a termination of his employment. Although union representatives later intervened on Saxton's behalf and advised him to return to work, the Board reasonably could have concluded from the record that Thompson terminated Saxton's employment on September 29, 2014. Accordingly, although reasonable persons might differ in their evaluation of the record evidence, we will not "displace the Board's choice between two fairly conflicting views" of the evidence. *Gestamp*, 769 F.3d at 263 (citation omitted).

We also conclude that substantial evidence supports the Board's finding that Saxton's actions were "reasonably directed toward the enforcement of [his] collectively bargained right," under Article 3, Section D of the CBA, not to accept overtime work

14

when a more junior employee was available.[3]  *See City Disposal Sys. Inc.*, 465 U.S. at 837.   Saxton plainly referred to the CBA when refusing the additional driving assignment, and the record contains evidence that at least three junior drivers were available to take the truck to the repair facility.   We therefore uphold the Board's determination that the employer violated the Act by terminating Saxton's employment on September 29, 2014, for engaging in concerted activity permitted under the CBA.  *See id.*

Our conclusion is not altered by the employer's contention that Saxton's use of profanity when refusing the overtime assignment rendered his concerted activity unprotected by the Act.  Although Saxton's conduct certainly was unprofessional, the Board reasonably could have concluded from the record that Saxton's actions were not sufficiently abusive, flagrant, or egregious under the circumstances to forfeit the protection of the Act.  *Id.*; *see also Media Gen. Operations, Inc. v. NLRB*, 560 F.3d 181, 186 (4th Cir. 2009) ("Even concerted actions that are assumed to be protected by the Act may forfeit such protection if they are 'egregious or flagrant.'" (citation omitted)); *Atl.*

---

[3] Relying on a provision of the CBA prohibiting union stewards from "caus[ing] any cessation of work or interference with the Employers' business," the employer also contends that Saxton forfeited the protection of the Act by refusing to report his disagreement with management to the union and follow management's directive in the meantime. *City Disposal Sys. Inc.*, 465 U.S. at 837 (a union and employer may agree in a CBA to limit the methods by which employees may invoke their collectively bargained rights).  We agree with the Board's conclusion that Saxton's decision to exercise his right to refuse overtime, when more junior drivers were available, does not implicate the CBA's prohibition against unprotected work stoppages.  Notably, Saxton did not "cause" any cessation of work, because one of these more junior drivers delivered the truck to the repair facility shortly after Saxton's refusal.

*Steel Co. v. Chastain*, 245 NLRB 814, 816 (N.L.R.B. 1979) (setting forth relevant factors to consider).

### III.

For these reasons, we conclude that the Board's decisions are supported by substantial evidence. Accordingly, we deny the employer's petition for review and grant the Board's cross-application for enforcement of its order.

*PETITION FOR REVIEW DENIED;*
*CROSS-APPLICATION FOR ENFORCEMENT*
*GRANTED*