**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1111**

PAC TELL GROUP, INC., d/b/a U.S. Fibers,

            Petitioner,

      v.

NATIONAL LABOR RELATIONS BOARD,

            Respondent,

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING,
ENERGY, ALLIED-INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL
UNION, LOCAL 7898,

            Intervenor.

**No. 15-1186**

NATIONAL LABOR RELATIONS BOARD,

            Petitioner,

      v.

PAC TELL GROUP, INC., d/b/a U.S. Fibers,

            Respondent.

On Petition for Review and Cross-Application for Enforcement of
an Order of the National Labor Relations Board.  (10-CA-139779)

Argued:  October 27, 2015          Decided:  December 23, 2015

Before KEENAN, WYNN, and DIAZ, Circuit Judges.

Petition for review denied; cross-application for enforcement granted by unpublished opinion. Judge Keenan wrote the opinion, in which Judge Wynn and Judge Diaz joined.

**ARGUED**: Reyburn Williams Lominack, III, FISHER & PHILLIPS LLP, Columbia, South Carolina, for Petitioner/Cross-Respondent. Julie Brock Broido, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. Mariana Padias, UNITED STEELWORKERS UNION, Pittsburgh, Pennsylvania, for Intervenor. **ON BRIEF**: Michael D. Carrouth, Jonathan P. Pearson, FISHER & PHILLIPS LLP, Columbia, South Carolina, for Petitioner/Cross-Respondent. Richard F. Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Michael Randall Hickson, Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.

Unpublished opinions are not binding precedent in this circuit.

BARBARA MILANO KEENAN, Circuit Judge:

In this appeal, we consider the National Labor Relation Board's (the Board) determination that four individuals employed by U.S. Fibers, who were engaged in pro-union activity before a union election, were not supervisors within the meaning of the National Labor Relations Act, 29 U.S.C. § 152(11) (the Act). Under our deferential standard of review, we conclude that the Board's decision is supported by substantial evidence. We also agree with the Board's conclusion that the four individuals did not engage in objectionable conduct sufficient to set aside the results of the election under the Board's third-party misconduct standard. For these reasons, we deny U.S. Fibers' petition for review of the Board's final order, and grant the Board's cross-application for enforcement of its order.

I.

U.S. Fibers (the employer) recycles polyester fibers at a plant located in Trenton, South Carolina. As relevant here, the employer utilized a tiered management structure as follows: Ted Oh served as vice president of operations, Kevin Corey as director of manufacturing, Glenn Jang as production manager, and Kyong Kang as production and quality assurance manager. These positions indisputably qualify as managerial in nature. At issue in this case is the alleged supervisory status under the

3

Act of four individuals, Jose Lal, David Martinez, Eduardo Sanchez, and Adauco Torres, who were designated by management as "supervisors" (the putative supervisors). The putative supervisors each oversaw the daily work performed by between 22 and 40 hourly workers during each 12-hour shift. These groups working each shift were subdivided into smaller teams of between three and five persons. Each team was assigned a "team lead" who was more skilled and experienced than the other members of the team. The "team leads" reported to the putative supervisors.

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union, Local 7898 (the union) filed an election petition with the Board, seeking to represent certain employees at the employer's Trenton plant. The Board directed an election over the employer's objection that the putative supervisors should not be included in the bargaining unit because of their alleged supervisory status. See 29 U.S.C. § 152(3). The union won the election by a twelve-vote margin, with four contested ballots cast by the putative supervisors.

The employer filed objections to the results of the election, arguing that the putative supervisors had engaged in objectionable conduct and that the results of the election should be set aside. The regional director of the Board

4

concluded that the employer had failed to establish that Lal, Martinez, Sanchez, and Torres were supervisors as defined in the Act. The Board adopted the regional director's reasoning and affirmed his decision. The Board also rejected the employer's alternative contention that the results of the election should be set aside under the Board's standard for third-party objectionable conduct. The regional director therefore certified the union as the employees' exclusive collective bargaining representative.[1]

Following issuance of the certification order, the employer refused to recognize or engage in collective bargaining with the union. The employer maintained the view that the Board's certification of the union was improper, and that the results of the election should be set aside. At the union's request, the Board filed a complaint against the employer, alleging that the employer had engaged in unfair labor practices under 29 U.S.C. § 158(a)(1) and (5). The Board ultimately ordered the employer to cease and desist its unfair practices and to recognize and bargain with the union upon request (the final order).

---

[1] The certification included "[a]ll full-time and regular part-time production, janitorial, warehousemen, shipping and maintenance employees, employed by the Employer at its Trenton, South Carolina facility, excluding all other employees, including office clerical employees, professional and confidential employees, guards and supervisors as defined in the Act."

5

The employer filed a petition for review of the Board's final order in this Court. The Board filed a cross-application for enforcement of the same order, and we granted the union's motion to intervene in support of the Board's decision.

## II.

We first set forth the general principles governing the scope of our review of Board-supervised elections. We presume that the results of such elections are valid, and we afford them great deference. NLRB v. Media Gen. Operations, Inc., 360 F.3d 434, 440-41 (4th Cir. 2004). Accordingly, we will set aside the results of an election only if the Board "has clearly abused its discretion." Id. at 441. We will affirm the Board's factual findings if they are supported by substantial evidence considering the record as a whole. CSX Hotels, Inc. v. NLRB, 377 F.3d 394, 398 (4th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," that is, more than a scintilla of evidence, but less than a preponderance. Gestamp South Carolina, L.L.C. v. NLRB, 769 F.3d 254, 263 (4th Cir. 2014) (citation omitted). We will defer to the Board's factual determinations even if we might have reached a different result in the first instance. Id.

6

A.

The employer first argues that the Board erred in concluding that Lal, Martinez, Sanchez, and Torres are not supervisors under the Act.[2] According to the employer, these individuals engaged in certain supervisory functions enumerated in the Act, namely, exercising the authority to assign, reward, discipline, and responsibly direct employees. The employer therefore contends that the election should be set aside because of pro-union activity by these alleged supervisors. We disagree with the employer's argument. Although the putative supervisors exercised some authority over other employees, we conclude that the Board's determination that the putative supervisors were not "supervisors" under the Act is supported by substantial evidence.

The Board may set aside an election if "conduct by supervisors, be it pro[-]union or anti[-]union, . . . interferes with the employees' freedom of choice," based on the reasoning that "employees may be induced to support/oppose the union because they fear future retaliation, or hope for preferential treatment, by the supervisor." Harborside Healthcare, Inc., 343 N.L.R.B. 906, 907 (2004). It is the burden of the party

---

[2] Because the Board adopted the reasoning of the regional director, our references to the Board's findings include those of the regional director.

7

asserting supervisory status to prove by a preponderance of the evidence that particular persons qualify as supervisors under the Act. Dean & Deluca N.Y., Inc., 338 N.L.R.B. 1046, 1047 (2003).

The Act defines "supervisor" as:

[A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11) (emphasis added). Individuals therefore qualify as supervisors only if they have the authority to engage in any one of the twelve supervisory functions in Section 152(11), including the four functions at issue in this case. NLRB v. Ky. River Cmty. Care, Inc., 532 U.S. 706, 713 (2001). Additionally, putative supervisors' "exercise of such authority [cannot be of] a merely routine or clerical nature, but requires the use of independent judgment," and their authority must be "held in the interest of the employer." Id. (citation and internal quotation marks omitted).

The Act's definition of "supervisor" is intended to distinguish "true supervisors vested with 'genuine management prerogatives,' [from] employees such as 'straw bosses, lead men, and set-up men' who are protected by the Act even though they

8

perform 'minor supervisory duties.'" Oakwood Healthcare, Inc., 348 N.L.R.B. 686, 688 (2006) (citation omitted).[3] Accordingly, the exercise of "independent judgment" requires that a person "act, or effectively recommend action, free of the control of others and form an opinion or evaluation by discerning and comparing data." Id. at 692-93 (citation omitted). Judgment is not independent under the Act if it is "dictated or controlled by detailed instructions, whether set forth in company policies or rules, the verbal instructions of a higher authority, or in the provisions of a collective bargaining agreement." Id. at 693. With these principles in mind, we turn to address each of the employer's four asserted bases for a finding of supervisory status.

i.

We begin by considering the putative supervisors' authority to assign the work of employees. The Board has defined the term "assign" in Section 152(11) as "the act of designating an employee to a place (such as a location, department, or wing), appointing an employee to a time (such as a shift or overtime

---

[3] The employer does not challenge the reasonableness of the Board's interpretation of the definition of "supervisor" set forth in Oakwood. Accordingly, we need not resolve the parties' dispute regarding whether this Court's precedent pre-dating the Supreme Court's decision in Kentucky River and the Board's decision in Oakwood remains controlling. Given the facts of this case, we can resolve the question of the putative supervisors' authority based on Oakwood and other recent cases.

9

period), or giving significant overall duties, i.e., tasks, to an employee." Oakwood, 348 N.L.R.B. at 689. "Assign" does not refer to an "ad hoc instruction that the employee perform a discrete task," nor does it include assignments made "solely on the basis of equalizing workloads." Id. at 689, 693. In the present case, the Board found that the putative supervisors' roles in assigning work did not require the use of independent judgment necessary to constitute supervisory authority under the Act.

The record reveals that Lal's and Sanchez's responsibilities included creating employee work schedules on a form previously prepared by Jang, a manager, based on Jang's instructions regarding the number of employees required for each shift. The evidence supports the conclusion that, when Lal assigned employees to work groups based on the employees' relative "experience," he only did so within the team lead structure imposed by management. The putative supervisors also instructed employees whether to follow the plant's "rule of thumb" to clean their work areas when machines malfunctioned, or instead to move to another work station.

We conclude that the Board reasonably found that none of these "assignment" functions required the use of independent judgment, because the decisions were made according to

10

parameters set by management or to equalize employee workloads.[4]
We therefore hold that the Board's decision regarding the
authority to assign is supported by substantial evidence.

ii.

We turn to consider whether the putative supervisors had
the authority to reward by evaluating employee performance for
the purpose of recommending raises.[5]   A person satisfies the
"authority to reward" definition in Section 152(11) if he
"play[s] a significant role in affecting" such raises.   Shaw,
Inc., 350 N.L.R.B. 354, 357 (2007).   The Board found that
although  Lal,  Sanchez,  and  Martinez  were  involved  in
recommending  employee  raises,  the  evidence  was  inconclusive
regarding  the  extent  to  which  the  putative  supervisors'
recommendations  affected  the  employer's  ultimate  decision.

---

[4] We disagree with the employer's contention that the
putative supervisors necessarily exercised the authority to
assign because they were the highest-ranking employees at the
plant during certain shifts.   Although this is one factor to
consider in our substantial evidence analysis, we cannot
conclude that this factor overrides the evidence that the
putative supervisors did not exercise independent judgment in
assigning work.

[5] The employer also argues that the putative supervisors
possessed the authority to reward because they could grant
overtime hours to employees.   Because the employer failed to
pursue this argument in the administrative proceedings, the
issue has been waived.   See 29 U.S.C. § 160(e) ("No objection
that has not been urged before the Board, its member, agent, or
agency, shall be considered by the court, unless the failure or
neglect to urge such objection shall be excused because of
extraordinary circumstances.").

11

The record demonstrates that the putative supervisors were responsible for evaluating a list of designated employees on a biannual basis to help determine which employees should receive raises. The putative supervisors made recommendations to the managers, in some cases proposing a specific amount of monetary increase, without the benefit of written guidelines. After receiving the recommendation of the putative supervisors, the managers offered their input to Oh, who made the ultimate decision. According to Jang, because his opinion about which employees deserved raises sometimes differed from that of the putative supervisors, he "combine[d]" his opinion together with the putative supervisors' opinions to determine the final proposal to give to Oh. Jang testified that management agreed with the putative supervisors' recommendations 90 percent of the time.

In our view, the Board could have concluded from this evidence that the putative supervisors at least had the authority "effectively to recommend" raises for employees. 29 U.S.C. § 152(11). Nevertheless, it also was reasonable for the Board to view this evidence of authority to reward as ambiguous with respect to the weight accorded to the putative supervisors' opinions, and to hold that the employer had failed to meet its burden of proving supervisory status. We therefore conclude

that the Board's determination regarding the authority to reward is supported by substantial evidence.

### iii.

Next, we consider whether the putative supervisors were given the authority to discipline employees within the meaning of Section 152(11), because the putative supervisors were responsible for issuing written warnings. The Board held that the employer failed to prove that the putative supervisors exercised independent judgment when they disciplined employees.

The record includes Lal's testimony that the managers provided blank warning forms to the putative supervisors, advised them of possible infractions, and instructed them to complete a form every time a worker disobeyed safety rules. All warnings were subject to approval by management before issuance. Cf. General Die Casters, 359 N.L.R.B. No. 7, at *81–82 (2012) (concluding that a putative supervisor exercised independent judgment in issuing discipline in part because there was "no credible evidence of any other supervisor being involved in the issuing of the[] warnings"). The putative supervisors issued warnings at the explicit direction of a manager in certain cases. In other instances, the putative supervisors simply implemented in a routine fashion the requirement that they warn employees who did not comply with certain workplace rules.

This evidence supports the Board's conclusion that the putative supervisors did not "act, or effectively recommend action, free of the control of others" when they issued warnings to employees. Oakwood, 348 N.L.R.B. at 692-93.[6] Accordingly, we conclude that substantial evidence supports the Board's finding that the putative supervisors did not use independent judgment in exercising this supervisory function.

Our conclusion with respect to disciplinary authority is not altered by the employer's reliance on Metro Transport LLC, 351 N.L.R.B. 657 (2007), in which a putative supervisor was chastised by a manager for failing to exercise his discretionary authority to discipline employees. Id. at 660. The Board found that the putative supervisor possessed the authority to exercise independent judgment in disciplinary decisions because (1) the putative supervisor was not merely a conduit for management's disciplinary decisions, (2) management did not conduct an independent investigation of such decisions made by the putative supervisor, and (3) "the determination of what discipline to

---

[6] The employer relies on Sanchez's statement that he disciplined an employee because the employee "disobeyed an order of work" by failing to "check all of the product" properly. Although this testimony could suggest that Sanchez used independent judgment in evaluating the need for certain discipline, it is unclear what "check[ing] all of the product" entails. We therefore conclude that Sanchez's unspecific testimony does not erode the substantial evidence supporting the Board's conclusion that independent judgment was not used.

14

impose would necessarily depend on [the putative supervisor's] independent judgment of what the situation warranted." Id. at 660-61.

In the present case, as in Metro Transport, management admonished putative supervisors for failing to issue warnings to employees who had committed safety violations. However, in contrast to Metro Transport, the putative supervisors here did not make an individualized assessment of the need for discipline, but instead acted as conduits for management's directive to enforce particular safety protocols. See Shaw, 350 N.L.R.B. at 356-57 (concluding that a putative supervisor did not exercise independent judgment in issuing discipline in part because the putative supervisor did not have the "discretion to decide which incidents to record" or to determine whether to complete a "write-up" form at all). Any discretion the putative supervisors had regarding the severity of appropriate discipline was limited to determining whether a first or subsequent warning was warranted given the employee's prior disciplinary history. For all these reasons, we hold that the record supports the conclusion that the putative supervisors did not exercise independent judgment in issuing discipline.

iv.

Finally, we consider whether the putative supervisors had the authority responsibly to direct employees by instructing

15

them regarding the manner in which they were to perform their duties. A putative supervisor "responsibly directs" another employee if he "direct[s] and perform[s] the oversight of the employee," and is "accountable for the performance of the task" by the employee "such that some adverse consequence may befall the one providing the oversight if the tasks performed by the employee are not performed properly." Oakwood, 348 N.L.R.B. at 690-92. As with the "assignment" and "discipline" inquiries, the Board concluded that the employer had not established that the putative supervisors used independent judgment in responsibly directing employees' work. Additionally, the Board concluded that the employer failed to show that the putative supervisors were held accountable for employees' work. Because we find that substantial evidence supports the Board's independent-judgment determination, we have no need to consider the question of the putative supervisors' accountability for the work of others.

When the work performed by employees "is routine and repetitive" and does not require "more than minimal guidance," direction from a putative supervisor does not involve independent judgment. Shaw, 350 N.L.R.B. at 356. Accordingly, although Lal testified that he told the employees "what they are going to do and how they are going to do it," and employees confirmed that they received direction from the putative

16

supervisors, this evidence is not dispositive of the responsible direction inquiry. The record indicates that the work performed by hourly employees at the plant was sufficiently routine that the employees did not require extensive direction. The evidence also shows that the managers gave the putative supervisors a list of work orders to be completed by employees during each shift, and that the managers communicated frequently with the putative supervisors regarding the assigned work, again indicating that the putative supervisors' discretion in directing employees was minimal.[7] Given the totality of the evidence, we conclude that substantial evidence supports the Board's determination that the putative supervisors did not exercise independent judgment in their direction of employees.

We acknowledge that there is some evidence in the record supporting the employer's view of the putative supervisors' authority regarding each of the four asserted supervisory functions. Nevertheless, we are not charged with evaluating the evidence de novo. Applying the deferential standard of review for substantial evidence, we conclude that the Board reasonably determined that the employer did not meet its burden of

---

[7] As with the authority to assign, we disagree with the employer that the putative supervisors exercised responsible direction merely because there were no managers present at the plant at certain times. Although the putative supervisors clearly directed employees' work to some extent, we must also analyze whether they did so with independent judgment.

17

establishing the supervisory status of Lal, Martinez, Sanchez, or Torres under 29 U.S.C. § 152(11). Accordingly, we will not set aside the results of the election on the basis of objectionable conduct by statutory supervisors. Cf. generally Harborside Healthcare, Inc., 343 N.L.R.B. 906 (2004) (explaining grounds for setting aside elections based on supervisory misconduct).

## B.

The employer argues, nonetheless, that even if Lal, Martinez, Sanchez, and Torres are not supervisors as defined in the Act, the Board election still should be set aside under the standard for objectionable conduct by third-party employees. The employer contends that Lal and Martinez "threatened" other employees that they could lose their jobs if the union did not win the election. We disagree with the employer's argument.

The Board may set aside an election based on employee, rather than supervisory, misconduct if such conduct "was so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible." Westwood Horizons Hotel, 270 N.L.R.B. 802, 803 (1984). To determine whether third-party threats are sufficiently serious to establish "a general atmosphere of fear and reprisal," we look to

18

the nature of the threat itself . . .[;] whether the threat encompassed the entire bargaining unit; whether reports of the threat were disseminated widely within the unit; whether the person making the threat was capable of carrying it out, and whether it is likely that the employees acted in fear of his capability of carrying out the threat; and whether the threat was 'rejuvenated' at or near the time of the election.

Id. However, "threats of job loss for not supporting the union, made by one rank-and-file employee to another, are not objectionable." Duralam, Inc., 284 N.L.R.B. 1419, 1419 n.2 (1987); see also Accubuilt, Inc., 340 N.L.R.B. 1337, 1338 (2003) (same).

We conclude that the challenged statements by Lal and Martinez do not meet the rigorous standard for objectionable third-party conduct. For example, Martinez told other employees that "there could be a possibility of [the employer] letting [employees] go" if workers supported the company, and Lal stated that if the employees did not "sign the union form" it would be "a lot easier for the Company to be able to let employees go." In our view, these statements merely constitute general comments about potential future job loss made by some employees to fellow employees.[8] Under the standards set forth in Duralam and Westwood, we hold that the Board did not clearly abuse its

---

[8] We similarly are unpersuaded by the employer's brief assertion that the putative supervisors' attendance at union meetings and solicitation of union authorization cards amounted to a "general atmosphere of fear and reprisal rendering a free election impossible." Westwood, 270 N.L.R.B. at 803.

19

discretion in declining to invalidate the results of the election on the basis of these challenged statements. See Media Gen. Operations, Inc., 360 F.3d at 441.

## III.

For these reasons, we deny the employer's petition for review of the Board's order, and grant the Board's cross-application for enforcement.

PETITION FOR REVIEW DENIED;
CROSS-APPLICATION FOR
ENFORCEMENT GRANTED