**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 21-1642**

SINAI HOSPITAL OF BALTIMORE, INC., d/b/a VSP,

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent,

and

1199 SEIU UNITED HEALTHCARE WORKERS EAST,

Intervenor.

**No. 21-1683**

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

SINAI HOSPITAL OF BALTIMORE, INC., d/b/a VSP,

Respondent.

and

1199 SEIU UNITED HEALTHCARE WORKERS EAST,

Intervenor.

On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board. (05-CA-265997)

Argued: March 10, 2022                    Decided: May 10, 2022

Before NIEMEYER, MOTZ, and KING, Circuit Judges.

Petition for review denied, and cross-application for enforcement granted, by published opinion. Judge King wrote the opinion, in which Judge Niemeyer and Judge Motz joined. Judge Niemeyer wrote a separate concurring opinion.

**ARGUED**: J. Eric Paltell, KOLLMAN & SAUCIER, P.A., Timonium, Maryland, for Petitioner/Cross-Respondent. Eric C. Weitz, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. Ashley Evangeline Macaysa, ABATO, RUBENSTEIN & ABATO, P.A., Baltimore, Maryland, for Intervenor. **ON BRIEF:** Jordan F. Dunham, KOLLMAN & SAUCIER, P.A., Timonium, Maryland, for Petitioner/Cross-Respondent. Jennifer Abruzzo, General Counsel, Peter Sung Ohr, Deputy General Counsel, Ruth E. Burdick, Deputy Associate General Counsel, David Habenstreit, Assistant General Counsel, Kira Dellinger Vol, Supervisory Attorney, Jared D. Cantor, Senior Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. James R. Rosenberg, ABATO, RUBENSTEIN & ABATO, P.A., Baltimore, Maryland, for Intervenor.

KING, Circuit Judge:

Sinai Hospital of Baltimore, Inc.'s Vocational Services Program ("VSP") seeks judicial review of a decision and order of the National Labor Relations Board (the "Board") finding that VSP engaged in unfair labor practices, in contravention of § 8(a)(1) and (5) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1), (5), by refusing to bargain with a Board-certified bargaining representative, 1199SEIU United Healthcare Workers East (the "Union"). *See Sinai Hosp. of Balt., Inc. d/b/a VSP*, 370 NLRB 129 (2021) (the "Bargaining Order"). Specifically, VSP contests the Board's underlying determination that certain disabled janitorial workers engaged by VSP are "employees" within the meaning of the Act. The Board cross-petitions for enforcement of the Bargaining Order. Because substantial evidence supports the Board's employee-status determination, we deny VSP's petition for judicial review and hereby grant enforcement of the Bargaining Order.

I.

A.

VSP is a department of Sinai Hospital, an acute care facility in Baltimore, Maryland, owned by LifeBridge Health, Inc. VSP encompasses a vocational and career-training program as well as a separate contracts and employment program, both of which are intended to assist individuals facing barriers to employment with preparation for competitive employment opportunities. Disabled individuals may be referred to VSP's vocational program — which offers career assessments, job skills training, and internships

— by any of a variety of nonprofit or government organizations. Following their graduation from the vocational program, disabled individuals become eligible for job placements through VSP's employment program. Such placements may be with Sinai Hospital itself; with an outside, private employer; or at a VSP contract site. Nondisabled individuals may also approach VSP seeking enrollment in the employment program, but are not eligible for participation in the vocational program.

As part of its employment program, VSP has contracted with the Social Security Administration (the "SSA") since at least 1987 to provide janitorial staffing at SSA facilities. VSP's contract with the SSA is governed by the federal AbilityOne program, a creation of the Javits-Wagner-O'Day Act (the "Javits Act") designed to employ disabled persons in providing commodities and services to the federal government. The terms of the Javits Act require, inter alia, that at least 75% of the janitors that VSP employs at its contract sites be "severely disabled." *See* 41 U.S.C. § 8501(6). VSP directly employs the disabled janitors involved in these proceedings at an SSA facility located in Maryland's Baltimore County. As of November 2019, VSP employed 44 janitors at that facility. Thirty-five of those VSP janitors were documented by annual employment evaluations as suffering from "severe" physical or mental disabilities, as defined by the Javits Act. The other nine VSP janitors working at the facility did not qualify as severely disabled. *See* A.R. 26-27, 270-71.[1]

---

[1] Citations herein to "A.R. __" refer to the contents of the Administrative Record filed in this matter.

The record reflects the following facts pertaining to the employment relationship between VSP and the janitors working at the Baltimore County SSA facility. All janitors at the facility — regardless of disability status — have substantially the same terms and conditions of employment, and the disabled janitors work alongside nondisabled janitors during standard eight-hour shifts. VSP maintains a progressive discipline system that, by its terms, applies equally to all janitors, although disabled janitors may receive modified job duties or counseling in lieu of formal discipline when they face difficulties in completing their assigned tasks. All VSP janitors can be — and, with some frequency, are — discharged for inadequate work performance, taking unauthorized breaks, failing to properly store supplies, and the like, even when a janitor's disability precipitates their performance issues. VSP supplies certain counseling and rehabilitative services to both disabled and nondisabled janitors, principally through a case manager named Veronica White, but does not employ any full-time counseling personnel at the SSA facility. Janitors tend to remain in their positions at the facility for several years, and VSP does not maintain a formal job-placement program. Between 2014 and 2019, VSP discharged 19 disabled janitors, while only seven left the SSA facility for outside employment during that period.

B.

On July 3, 2019, the Union filed a petition with the Board seeking to represent the VSP janitors working at the SSA facility. The Union petitioned to represent a bargaining unit consisting of "[a]ll full time regular and part time janitors and housekeepers employed by [VSP] at the [SSA facility]," without regard for disability status. *See* A.R. 257-58. VSP contested the Board's jurisdiction over the proposed unit of janitors, asserting that the

Union's petition should be dismissed because the disabled janitors at the SSA facility have a "primarily rehabilitative" relationship with VSP, such that — under the standard articulated by the Board in its decision in *Brevard Achievement Center, Inc.*, 342 NLRB 982 (2004) — they are not "employees" as contemplated by § 2(3) of the Act.[2]

The Board thereafter conducted two representation hearings in July and September 2019. The Board received testimony and exhibits from four VSP witnesses, including case manager White, as well as from two janitors employed at the SSA facility — one disabled, and one nondisabled. VSP and the Union also filed formal briefs with the Board following each hearing.

On November 29, 2019, the Acting Regional Director for the Board's Region 5 issued a Decision and Direction of Election resolving that the disabled janitors engaged by VSP are in fact statutory "employees." *See* A.R. 819-45. After assessing the factors set forth in the Board's *Brevard* decision, the Decision and Direction of Election concluded that VSP had failed to satisfy its burden of demonstrating a "primarily rehabilitative" employment relationship, and that VSP's relationship with the disabled janitors was instead more appropriately classified as "typically industrial." *Id.* at 820-21 (citing *Brevard*, 342 NLRB at 984). The Acting Regional Director acknowledged that certain evidence at the

---

[2] VSP also argued that, if the Board found the disabled janitors not to qualify as statutory "employees," the nondisabled janitors at the SSA facility should be held as an impermissible "microunit," thereby prohibiting the Union from representing those janitors independently of the disabled janitors. *See* A.R. 820. Because it resolved that the disabled janitors are indeed "employees," the Board dismissed VSP's contention as moot. Accordingly, the Board ultimately certified the Union as the collective bargaining representative for all janitors employed at the SSA facility. *Id.* at 841.

representation hearings suggested a "rehabilitative" relationship, but found that, on balance, most of the evidence was illustrative of a traditional economic relationship.

Accordingly, the Acting Regional Director ruled that both the disabled and nondisabled janitors working at the SSA facility are "employees" as contemplated by the Act and ordered a Board-supervised secret ballot election. *See* A.R. 839-41. The Union prevailed in that election by a vote of 28 to 13 and, on December 30, 2019, the Acting Regional Director certified the Union as the exclusive collective bargaining representative of the VSP janitors. VSP sought review of the Decision and Direction of Election's employee-status determination, but a three-member panel of the Board denied that request on May 27, 2020, citing a lack of substantial issues warranting review.

C.

Notwithstanding the Union's successful election and certification, VSP refused to recognize it as the janitors' bargaining representative or to engage in the bargaining process. The Union thus filed an unfair labor practice charge with the Board on September 11, 2020, and the Board's General Counsel thereafter issued a complaint alleging that VSP had violated § 8(a)(1) and (5) of the Act by refusing to bargain in good faith with the Union. *See* A.R. 933-39.[3] The General Counsel moved the Board for summary judgment and, in response, VSP again raised its contention that the disabled janitors are not statutory

---

[3] Section 8 of the Act defines certain unfair labor practices that may not be committed by employers or unions, and subsections (a)(1) and (a)(5) respectively prohibit employers from interfering, restraining, or coercing employees in the exercise of their rights to self-organize and to bargain collectively, and from refusing to bargain with a certified representative. *See* 29 U.S.C. § 158(a)(1), (5).

"employees." VSP did not dispute its refusal to recognize or bargain with the Union, but simply maintained that it had no duty in law to bargain because the Board's underlying certification of the Union was fatally erroneous.

On May 25, 2021, a three-member panel of the Board granted the General Counsel's motion for summary judgment, ruling in its Bargaining Order that VSP's refusal to bargain with the Union constituted an unfair labor practice under the Act. The Bargaining Order directed VSP to recognize the Union as the certified representative of the janitors working at the SSA facility; to engage in the bargaining process at the request of the Union; to refrain from intrusions on the rights afforded to the janitors by § 7 of the Act; and to post certain remedial notices at the SSA facility. *See* Bargaining Order 3. The Board declined to address VSP's renewed employee-status argument, resolving that because VSP had failed to adduce newly discovered evidence or special circumstances calling for reconsideration of the Board's earlier factual determination, it had not presented a "properly litigable" issue in the unfair labor practice proceeding. *Id.* at 1.

VSP timely filed a petition for review of the Bargaining Order with this Court on June 2, 2021. Because the Bargaining Order was based in part on the Board's determination in the 2019 Decision and Direction of Election that the disabled VSP janitors are statutory "employees," that determination and the associated administrative record are also before the Court in this matter. *See* 29 U.S.C. § 159(d) (permitting review of underlying representation proceedings where court of appeals reviews an unfair labor practice order predicated on such proceedings); *see also Boire v. Greyhound Corp.*, 376 U.S. 473, 477 (1964). Two weeks later, on June 16, 2021, the Board filed a cross-

8

application for enforcement of the Bargaining Order, and the Union was thereafter permitted to intervene in these proceedings in support of the Board's cross-application. We possess jurisdiction pursuant to 29 U.S.C. § 160(e)-(f) (authorizing petition for review or enforcement of final order of Board in appropriate court of appeals).

## II.

VSP now advances its prior position — asserted in the underlying representation and unfair labor practice proceedings — that its relationship with the disabled janitors working at the Baltimore County SSA facility is "primarily rehabilitative" in nature, and that the Board's Decision and Direction of Election incorrectly classified the disabled janitors as statutory "employees." VSP argues that the Board therefore lacked jurisdiction to certify the Union as the janitors' collective bargaining representative and that the Bargaining Order was in error by association.

We review the Board's findings of fact — including the status of workers as "employees" within the meaning of the Act — only to determine if those findings are "supported by substantial evidence in the record as a whole." *See Lee v. NLRB*, 393 F.3d 491, 494 (4th Cir. 2005) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). "Substantial evidence" means "more than a scintilla of evidence, but less than a preponderance." *See Pac Tell Grp., Inc. v. NLRB*, 817 F.3d 85, 90 (4th Cir. 2015). As a result, our review of the Board's decision is "limited," *see Tenocap, LLC v. NLRB*, 1 F.4th 304, 312 (4th Cir. 2021), and we "extend considerable deference to the NLRB's interpretation of [the Act's definition of 'employee'] and its application of [that] provision

9

to a particular worker or class of workers," *see NLRB v. Labor Ready, Inc.*, 253 F.3d 195, 199 (4th Cir. 2001). In these circumstances, because ample record evidence supports the Board's employee-status determination, we are obliged to enforce its Bargaining Order.

III.

A.

Section 7 of the Act vests the right to engage in concerted activity for purposes of collective bargaining "or other mutual aid or protection" only in "employees." *See* 29 U.S.C. § 157. Section 2(3) of the Act, meanwhile, defines an "employee" simply — if perhaps unhelpfully — as "any employee." *Id.* § 152(3). The Supreme Court has observed that the Act "seems to reiterate the breadth of the ordinary dictionary definition" of that term, such that it captures "any person who works for another in return for financial or other compensation." *See NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 90 (1995) (quoting American Heritage Dictionary 604 (3d ed. 1992)).

Under Board precedent, the statutory "employee" status of disabled individuals working in rehabilitative vocational settings turns on whether the relationship between worker and putative employer is best characterized as "typically industrial" or instead "primarily rehabilitative." *See Brevard Achievement Ctr., Inc.*, 342 NLRB 982, 983-84 (2004); *Goodwill Indus. of Denver*, 304 NLRB 764, 765 (1991). The Board declines to assert jurisdiction over "primarily rehabilitative" employment relationships as a prudential matter, in recognition of the fact that the Act "contemplates a primarily economic relationship between employer and employee," wherein "employees who do not possess

full freedom of association or actual liberty of contract" will experience an inequity of bargaining power as compared to their better-organized employers. *See Brevard*, 342 NLRB at 984-85 (quoting 29 U.S.C. § 151). But "[i]t is well-established that the Board is not precluded from asserting its jurisdiction merely because an employer is . . . engaged in a worthy purpose," and the Board classifies individuals working in rehabilitative settings as "employees" if there is a classically economic working relationship with the employer that is "typically industrial" and reflects "private sector working conditions." *See Goodwill Indus. of Denver*, 304 NLRB at 765-66; *see also Balt. Goodwill Indus., Inc. v. NLRB*, 134 F.3d 227, 229 (4th Cir. 1998).

The "typically industrial" versus "primarily rehabilitative" determination calls for a case-by-case factual assessment, and "the party seeking . . . to exclude otherwise eligible employees from the coverage of the Act" bears the burden of proving a "primarily rehabilitative" employment relationship to the Board. *See Goodwill Indus. of N. Ga., Inc.*, 350 NLRB 32, 35 (2007). In conducting that analysis, the Board weighs the following, non-exhaustive list of factors identified in its *Brevard* decision:

(1)     The existence of employer-provided counseling, training, or rehabilitative services;

(2)     The existence of any production standards;

(3)     The existence and nature of disciplinary procedures;

(4)     The applicable terms and conditions of employment (particularly in comparison to those of nondisabled individuals employed at the same facility); and

(5)     The average tenure of employment, including the existence/absence of a job-placement program.

11

*See Brevard*, 342 NLRB at 984.

B.

In concluding that VSP had failed to meet its burden of demonstrating a "primarily rehabilitative" employment relationship, the Board resolved that the disabled janitors' affiliation with VSP is more akin to that found in traditional private sector employment settings, such that the Act's leading purpose of restoring balance to bargaining power disparities is served by classifying the janitors as statutory "employees." *See* A.R. 839. To be sure, the Board acknowledged that certain testimony received during its representation hearings pointed toward a "primarily rehabilitative" relationship. But it ultimately ruled that "[those] facts are insufficient to overcome the other facts supporting a traditionally industrial relationship" and that each *Brevard* factor weighed against finding a principally "rehabilitative" connection between VSP and its disabled janitors. *Id*. Our review of the record fully supports the Board's determination.

1.

The Board first found that the terms and conditions of employment for VSP's disabled and nondisabled janitors are "virtually indistinguishable," thereby suggesting a "typically industrial" relationship under *Brevard*. *See* A.R. 828. The Board relied on evidence indicating that all janitors at the SSA facility — regardless of disability status — are assigned to shifts of the same length; receive equivalent wages and benefits; have the same job description; and are afforded equal amounts of break time. The Board also observed that a 90-day probationary period applies to all newly hired janitors and that VSP

12

has demonstrated a "ready willingness" to discharge any janitor rendering unsatisfactory performance during that probationary period. *Id.* at 839. Testimony further indicated that all janitors are expected to complete their assigned tasks during their shift, and the Board took that policy to indicate the implementation of production standards, following its conclusion in *Goodwill Industries of North Georgia* that an identical requirement evidenced the employer's maintenance of productivity standards and weighed against a finding of a "primarily rehabilitative" relationship with disabled janitorial workers. *See* 350 NLRB at 38.

VSP's case manager, Veronica White, maintained that although all janitors have the same job description, disabled janitors may have their assigned tasks modified if their disabilities interfere with successful completion of those tasks. But the two janitors who appeared at the Board's representation hearings — Gregory Parker and Wilzona Tyler — refuted White's testimony, relating that they had not previously witnessed any task modifications because of a colleague's disability-related difficulties. The Board observed that White does not work full-time at the SSA facility and is there only "one or two times a week," and also that VSP neglected to call any supervisors or other personnel working at the SSA facility daily. *See* A.R. 829. Accordingly, the Board accorded "greater weight" to Parker and Tyler's testimony and found that, in any event, no testimony indicated that VSP's disabled janitors could "work at their own pace" as in the Board's *Brevard* decision, where disabled workers and their employer were held to possess a "primarily rehabilitative" relationship. *Id.* at 827-28; *Brevard*, 342 NLRB at 983. Despite some inconsistency regarding the lenience afforded to VSP's disabled janitors, substantial

13

evidence supports the Board's judgment that universally applied terms and conditions of employment, as well as the general maintenance of productivity standards, disfavor finding a "primarily rehabilitative" workplace relationship in this case.

2.

The evidence presented to the Board made clear that VSP does provide certain counseling and rehabilitative services to its disabled (and nondisabled) janitors, primarily through White. As previously noted, White works at the SSA facility only one to two days per week; she is otherwise "on call" while working at other VSP facilities. *See* A.R. 138-39. White provides a range of services to all janitors at the SSA facility — including assistance with budgeting, locating housing, scheduling medical appointments, and drafting resumés — although janitors are not required to meet with White on any fixed schedule. No evidence indicates that VSP employs any full-time job trainers, mental health counselors, or other comparable personnel at the SSA facility. VSP thus stands apart from the employer in the Board's 1991 *Goodwill Industries of Tidewater* decision, where the employer's retention of a full-time job-placement counselor and assignment of a dedicated skills trainer to each of its disabled janitorial employees informed the Board's finding of a "primarily rehabilitative" employment relationship. *See* 304 NLRB 767, 768-69 (1991).

The record shows that VSP's disabled janitors do have access to "job coaches" that visit the SSA facility and assist janitors in completing their work, but White testified that those coaches "work in conjunction with [VSP]" and "are generally employed through other agencies," such as Baltimore nonprofit organizations. *See* A.R. 427-29. Accordingly, the Board discounted the job coaches as not qualifying as an "employer-

14

provided" counseling service. *Id.* at 832. Other VSP managers testified as to VSP's employment of nine "job-retention" counselors of its own, but those counselors do not work at the SSA facility, are part of VSP's distinct vocational program (not its employment program), and, as the Board observed, the two testifying janitors stated that "they had never heard of these nine counselors prior to the hearing." *Id.* at 37-39, 832.

The Board acknowledged that, especially in view of White's services, "there are some rehabilitative elements" to VSP's relationship with its disabled janitors. *See* A.R. 831. The Board also observed, however, that White spends relatively little time at the SSA facility, that she is "essentially [VSP's] sole source of counseling, training, and rehabilitation services," and that her services "would be more significant" if they were offered only to disabled janitors. *Id.* at 829, 831. Given that VSP appears to employ no full-time counseling personnel at the SSA facility and that its maintenance of a probationary period "is inherently contradictory to a rehabilitative relationship," the Board resolved that *Brevard*'s "counseling services" factor weighed against finding a "primarily rehabilitative" relationship. *Id.* at 833. Although we recognize that the record confirms VSP's provision of at least some rehabilitative and counseling services to its disabled janitors, we are satisfied that far more than "a scintilla of evidence" supports the Board's finding that VSP's services are not sufficient to establish a rehabilitative relationship standing alone. *See Pac Tell Grp., Inc. v. NLRB*, 817 F.3d 85, 90 (4th Cir. 2015).

### 3.

Among the *Brevard* factors, the Board appeared to find the one designated as "the existence and nature of disciplinary procedures" as the most problematic for VSP in

demonstrating a "primarily rehabilitative" relationship. Indeed, the record reveals that VSP applies a progressive discipline system to all of its janitors — once more irrespective of their disability status — and an exhibit setting forth the terms of that system indicates that supervisors are not directed to discipline disabled janitors less severely or otherwise differently than nondisabled janitors. *See* A.R. 306-17. Testifying at the September 2019 representation hearing, a VSP project manager confirmed that she considered the same criteria when applying corrective actions to disabled and nondisabled janitors. *Id.* at 516-18. The Board reiterated its concern with VSP's maintenance of a probationary period applicable to the disabled janitors, and recognized that disabled janitors who exhaust their available corrective discipline options will be discharged, ordinarily without eligibility for rehiring. And the record confirms that disabled janitors have been fired for a variety of infractions, including punctuality and attendance issues, inappropriate behavior, taking unauthorized breaks, and failing to properly store supplies. In that sense, this matter stands in stark contrast to the D.C. Circuit's decision in *Davis Memorial Goodwill Industries, Inc. v. NLRB*, where disabled workers in a "primarily rehabilitative" employment setting "could not be discharged" at all, but were instead referred to a rehabilitation program when they violated workplace rules. *See* 108 F.3d 406, 411 (D.C. Cir. 1997).

The Board credited testimony that disabled janitors who have committed infractions are often counseled by White instead of facing formal disciplinary measures, and the record confirms that disabled janitors are disciplined less frequently than their nondisabled colleagues. White testified, however, that nondisabled janitors are also given an opportunity to meet with her when disciplinary actions are under consideration, and the

16

Board opined that, despite the evidence of leniency, "[VSP] will issue discipline to janitors at the [SSA facility] for misconduct related to their disabilities." *See* A.R. 835. As the Board observed, that practice departs from the standards of the "primarily rehabilitative" employer in the *Brevard* decision, where disabled janitors were fully "exempt from discipline for any conduct related to their disabilities." *See* 342 NLRB at 983, 986. That practice also renders this case distinct from the Board's decision in *Goodwill Industries of Denver*, where the employer disciplined its disabled workers "only in extreme cases" and the Board found the workers not to be statutory "employees." *See* 304 NLRB at 765-66. Put simply, the evidence demonstrates that VSP disciplines and discharges its disabled janitors with some regularity, thereby supporting the Board's determination that VSP's relationship with the janitors is less "rehabilitative" and more typical of ordinary private sector employment.

4.

The Board lastly compared VSP's employment program to instances where "rehabilitative" employers maintain robust job-placement programs and where their disabled employees "routinely make the transition to competitive employment." *See* A.R. 837. Although case manager White does provide some job-placement services to VSP's disabled janitors — including assistance with resumé drafting and conducting mock interviews — VSP does not employ a full-time job-placement coordinator and lacks a formal program designed to aid janitors in securing competitive employment outside the SSA facility. Nor are any time limits placed on janitors' tenure at the facility. The record suggests that, on average, janitors stay with VSP for about 13 years. *Id.* at 54. And in the

17

five years preceding the Board's 2019 representation hearings, only seven disabled janitors left VSP for outside employment — two of whom reported receiving assistance from White — while VSP discharged 19 disabled janitors during that same period.

Accordingly, the Board resolved that "it is significantly more likely that [VSP] will discharge one of its disabled workers at the [SSA facility] than help transition that worker to private competitive employment." *See* A.R. 838. Once again, the record evidence pertaining to employee tenure and the lack of a noteworthy job-placement program lends strong support to the Board's ultimate employee-status determination.

## C.

Based on the record as a whole, and in consideration of the deference that we must afford the Board's factual findings, substantial evidence supports the Board's determination in its Decision and Direction of Election that VSP failed to demonstrate a "primarily rehabilitative" employment relationship and that its disabled janitors are "employees" within the meaning of the Act. The Board therefore possessed jurisdiction to certify the Union as the bargaining representative of the VSP janitors. Because VSP admitted its refusal to bargain with the Union in contravention of § 8(a)(1) and (5) of the Act, there is no error in the Bargaining Order, and we grant its enforcement.

## IV.

Pursuant to the foregoing, we deny VSP's petition for review and grant the Board's cross-application for enforcement of the Bargaining Order.

NIEMEYER, Circuit Judge, concurring:

I have substantial doubt that categorically the disabled janitors employed by Vocational Services Program (VSP) at the Social Security Administration (SSA) site in Baltimore are entitled to collective bargaining rights under the National Labor Relations Act (NLRA). The NLRA's collective bargaining guarantees are intended to balance bargaining power disparities between employers and employees engaged in a traditional economic employment relationship. In recognition of this statutory intent, the National Labor Relations Board (NLRB) has held that workers engaged in rehabilitative — rather than economic or "typically industrial" — relationships with their employer are not "employees" entitled to collective bargaining rights under the NLRA. *See, e.g.*, *Brevard Achievement Ctr., Inc.*, 342 N.L.R.B. 982, 983–86 (2004). VSP, however, hired disabled janitors to provide services to the SSA pursuant to the AbilityOne Program authorized by the Javits-Wagner-O'Day Act, 41 U.S.C. §§ 8501–8506. This Act creates a statutory and regulatory framework aimed at "increas[ing] employment and training opportunities for [disabled] persons" by promoting the federal government's procurement of goods and services from nonprofit agencies that employ disabled individuals. 41 C.F.R. § 51–1.1. The Act and its implementing regulations *mandate* a rehabilitative — not economic — relationship between the employer nonprofit agencies and their disabled employees, requiring that the agencies, for example, deliver the majority of their services through disabled persons unable to participate in "normal competitive employment"; that they maintain job placement programs to transition those workers to competitive employment; and that they adhere to other parameters foreign to traditional economic employment

20

relationships. *See id.* §§ 51–1.3, 51–4.3. The parties do not dispute that VSP is in compliance with the requirements of the Javits-Wagner-O'Day Act and its regulations. Because of this, I would approach this case — and any case involving disabled workers employed pursuant to the Javits-Wagner-O'Day Act — with a strong presumption that the employees are engaged in a rehabilitative employment relationship with their employer and are therefore not entitled to the NLRA's collective bargaining guarantees.

Collective bargaining is afforded by the NLRA to "restor[e] equality of bargaining power between employers and employees." 29 U.S.C. § 151. The Act contemplates an "arms-length economic relationship[]" between employers and employees, under which the two sides jockey for advantage "through a contest of economic strength." *Brevard,* 342 N.L.R.B. at 985; *see also NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 288 (1972) (stating that "[t]he congressional policy manifest in the [NLRA] is to enable the parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities"). In this traditional economic relationship, employers are generally incentivized to minimize the wages and benefits that they provide to their employees in order to increase profits, whereas employees are incentivized to maximize those wage-and-benefit outlays. While the ability of any individual employee to negotiate successfully for higher wages or benefits is negligible, collective bargaining allows employees to "pool[] their economic strength" and thereby enhance their bargaining power. *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967). And with that enhanced bargaining power, employees can negotiate with their employers on a more-level playing field. *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177,

183 (1941) (asserting that the NLRA "leaves the adjustment of industrial relations to the free play of economic forces but seeks to assure that the play of those forces be truly free"). At bottom, then, the employees contemplated by the NLRA are best understood as individuals who can benefit economically from collective bargaining with their employers.

The employees in this case, however, do not fit that profile. Here, the relevant workers are disabled janitors working for a government-determined wage under a program designed to rehabilitate their vocational skills and transition them to competitive economic employment. Thus, their relationship with their employer was not created for profit but rather for rehabilitative purposes, in accordance with the design of the Javits-Wagner-O'Day Act.

The fundamental purpose of the Javits-Wagner-O'Day Act is directed specifically at the rehabilitation of *severely disabled persons* in respect to employment. *See* 41 C.F.R. § 51–1.1. The House Committee on Government Operations, for example, in a report issued shortly before the Act's passage, framed the Act as "an important rung in the ladder toward expanding a successful self-help rehabilitation program through work." H.R. Rep. No. 92-228, at 6 (1971). And the Senate Committee on Labor and Public Welfare similarly highlighted how the Act would transition disabled workers from "dependency" to "self-sufficiency." S. Rep. No. 92-41, at 2 (1971). For implementation, the Act tasked the Committee for Purchase From People Who Are Blind or Severely Disabled (now known as the "AbilityOne Commission") with maintaining a federal procurement list of products and services offered by "qualified nonprofit agenc[ies]" that employ the blind and severely disabled. *See* 41 U.S.C. § 8503(a). To obtain federal contracts through this procurement

22

list, qualified nonprofits — like VSP — must ensure that at least 75% of the "work-hours of direct labor required to furnish [their] . . . services" are provided by "persons with severe disabilities," defined as those who have "a severe physical or mental impairment . . . which so limits [their] functional capabilities . . . that [they are] unable to engage in normal competitive employment over an extended period of time." 41 C.F.R. § 51–1.3; *see also* 41 U.S.C. § 8501(6), (8). Nor is it sufficient for these qualified nonprofits simply to *employ* disabled individuals. Rather, regulations impose a range of requirements on qualified nonprofits to ensure that they are complying with the Act's rehabilitative aims. For example, these regulations require, *inter alia*, that qualified nonprofits maintain job placement programs to assist their workers in transitioning to "normal competitive employment"; that they maintain written documentation detailing each disabled worker's disability and ability to participate in competitive employment; and that they complete annual compliance certifications and comply with ad hoc records requests from AbilityOne Program authorities. *See* 41 C.F.R. § 51–4.3. Thus, the employment relationship *mandated* by the Act's requirements is inherently rehabilitative, rather than economic. The parties in this case do not dispute that VSP was properly functioning in accordance with those requirements. Indeed, the record in this case shows how VSP's relationship with its disabled employees at the SSA site aligns with the rehabilitative aims of the Javits-Wagner-O'Day Act.

The record in this case shows that VSP is a distinct department of Sinai Hospital of Baltimore that exists to provide employment opportunities to individuals with disabilities with the goal of helping those individuals to "lift themselves up to find [job] placement"

23

elsewhere. Many of the individuals coming to VSP are referred to it by the Maryland Division of Rehabilitation Services, the Department of Veterans Affairs, and other community rehabilitation providers such as The ARC Baltimore or Chimes. Of the 44 janitors VSP employed to work at the SSA site, 35 were severely disabled. VSP does not make any profit from the employees' work at the SSA and the wages that it pays are "solely funded" by its contract with SSA at rates "controlled by" Department of Labor wage determinations. In short, VSP functions to benefit disabled workers by rehabilitation, *not to make a profit*, and the relationship it has with its employees is thus fundamentally unlike the traditional economic employment relationships the NLRA is designed to regulate.

Importantly, the NLRB has recognized the distinction between economic and rehabilitative employment relationships, concluding that rehabilitative employees are not statutory employees under the NLRA. *See Brevard*, 342 N.L.R.B. at 984–85; *see also Balt. Goodwill Indus., Inc. v. NLRB*, 134 F.3d 227, 229–31 (4th Cir. 1998) (per curiam). As the Board has explained, a rehabilitative employer's objective in hiring an individual is not to maximize its own profits or otherwise secure its own economic advantage, but rather to "rehabilitat[e] [the individual] and prepar[e] them for work in private competitive industry." *Goodwill Indus. of S. Cal.*, 231 N.L.R.B. 536, 537 (1977), *overruled on other grounds by Goodwill Indus. of Denver*, 304 N.L.R.B. 764 (1991). Thus, "[t]he conflicting interests present in traditional, primarily economic employment relationships are absent" in the rehabilitative context. *Brevard*, 342 N.L.R.B. at 985–86; *see also Goodwill Indus. of S. Cal.*, 231 N.L.R.B. at 537 (describing how a rehabilitative employer's "primary objectives are the converse of a normal employer's objectives"). And because of this, the

24

Board has recognized that the injection of collective bargaining into rehabilitative employment contexts might actually *undermine* the rehabilitative purpose of such arrangements. *See Brevard*, 342 N.L.R.B. at 988 (reasoning that "[t]he imposition of collective bargaining at the rehabilitative stage could interfere with the rehabilitation process itself"). As the Board in *Brevard* summarized:

> The imposition of collective bargaining on relationships that are not primarily economic does not further the policies of the [NLRA]. The Act is premised on the view that in arms-length economic relationships, there can be areas of conflict between employers and employees that, if the parties cannot reach agreement, can be resolved through a contest of economic strength in the collective-bargaining process if the employees choose to bargain collectively. This premise is not well suited to a setting that is not primarily economic but primarily rehabilitative.

*Id.* at 985; *see also Balt. Goodwill Indus.*, 134 F.3d at 229; *Davis Mem'l Goodwill Indus., Inc. v. NLRB*, 108 F.3d 406, 410 (D.C. Cir. 1997).

In sum, while the NLRA protects employees in an *economic* relationship with their employers, disabled workers employed in compliance with the Javits-Wagner-O'Day Act are necessarily in a *rehabilitative* relationship with their employers. Accordingly, I would approach this case with a strong presumption that disabled employees hired under a Javits-Wagner-O'Day Act program, such as the one conducted by VSP, are not, as a class, "employees" within the ambit of the NLRA and therefore are not entitled to the collective bargaining rights afforded by the Act. *See* 29 U.S.C. § 157.

Had VSP argued for such a categorical presumption before us, I would have welcomed the discussion and engaged both parties on that point. Instead, however, VSP focused its briefing on whether substantial evidence supported specific factual findings

made by the Board.  Because the record includes substantial evidence to support those findings, albeit narrow in scope, I concur in the opinion of Judge King, which ably demonstrates this.